108 P.3d 768 (2005)
153 Wash.2d 812
Eliot B. MOHR, individually; Mohr & Company, Inc. d/b/a Kitchen Interior Showcase, Respondents,
v.
Tom GRANT and "Jane Doe" Grant, husband and wife, individually, and the marital community composed thereof; and Spokane Television, Inc., a Washington corporation d/b/a/ KXLY-TV, Petitioners.
No. 74208-1.
Supreme Court of Washington, En Banc.
Argued May 13, 2004.
Decided March 24, 2005.
*769 Laurel Hobbs Siddoway, Spokane, for Petitioners.
Ryan Marshall Beaudoin, Witherspoon Kelley Davenport & Toole PS, Spokane, for Respondents.
Bruce Edward Humble Johnson, Michele Lynn Earl-Hubbard, Alison Page Howard, Eric B. Martin, Davis Wright Tremaine LLP, Seattle, for Amicus Curiae Allied Daily Newspaper of Wash. Inc., Fisher Communications Inc., Gannett Co. Inc., Kittitas County Pub. LLC, Puget Sound Business Journal, Reporters Committee for Freedom of the Press, Skagit Valley Pub. Co., Society of Professional Journalists, The Columbian, The Daily World, The McClatchy Co., The Seattle Times, The Yakima Herald-Republic, Wash. Newspaper Publishers Ass'n, Wash. State Ass'n of Broadcasters.
FAIRHURST, J.
¶ 1 Respondents, Eliot B. Mohr and Mohr & Company, Inc., d/b/a Kitchen Interior Showcase (hereinafter Mohr or KIS), filed a defamation suit alleging that a series of newscasts aired by petitioners, KXLY-TV and reporter Tom Grant (hereinafter KXLY and Grant), were defamatory because they contained false statements and omitted material facts. The trial court granted KXLY and Grant's motion for summary judgment, holding that Mohr failed to establish falsity with convincing clarity because the newscasts did not contain false statements and the newscasts were substantially true. The Court of Appeals reversed, holding that Mohr presented sufficient evidence as to whether material omissions rendered the newscasts defamatory. We reverse and grant KXLY and Grant's motion for summary judgment.

I. FACTS
¶ 2 A lawyer informed Grant that the Spokane County Prosecutor's Office was prosecuting a developmentally disabled man who appeared incapable of understanding the proceedings against him. Grant learned that the man was Glen Burson, a 40 year old with Down's syndrome who possessed the mental capacity of a 5 year old. Grant reviewed Burson's court file and photocopied the incident history and incident reports contained therein.[1] He used on-line resources to check *770 for pending cases involving Burson, but found none. He spoke with the defense attorney and the disability advocate working on the case. He interviewed Burson as well as his mother, brother, and sister. He contacted the prosecutor working on the case, her supervisor, and Mohr, but they all refused to discuss the case.
¶ 3 On November 16, 1998, KXLY aired an initial newscast. It opened with references to equal protection and Burson's having Down's syndrome. It then turned to the events leading to Burson's arrest and the negative effects of the prosecution on Burson:
MR. GRANT: Glen walked up to Kitchen Interiors Showcase last April. He had washed windows here before for free, but the owner complained that Glen smudged the glass and told Glen to stay away. Here's Glen's account of what happened when he returned in April.
MR. GLEN BURSON: He did my arm, okay. He did that, (indicating). Then he started to hit me. "Go away." I am not like that.
MR. GRANT: This is the account from the police report. The store owner says that Glen came in wanting candy and he refused to leave. When the store owner finally got him to go outside Glen was angry and he crossed his throat like this. That scared the owner so they called [the] police. And the police charged him with criminal trespass and harassment, charges that Glen really doesn't understand.
MR. HOMER BURSON: It kind of bewilders him. He knows that he is in trouble, he is not sure for what. But he knows he can't go back up there and he won't ever go back up there.
MR. GLEN BURSON: No, I won't go there anymore.
MR. GRANT: Yet even through Burson has no previous criminal history the courts won't let him go. At one point prosecutors wanted this boy, who has never been away from his mother, locked up for a 14 day evaluation at Eastern State Hospital. As eight months of court dragged by, the usually pudgy Glen lost more than 20 pounds, and he lost all sense of worth.
MR. GLEN BURSON: I try to help. I can't no more, (crying).
Clerk's Papers (CP) at 116-18. In the closing segments of the newscast, a former defense attorney commented on the prosecutor's office and its pursuit of cases that should not be prosecuted. Burson explained that he did not understand the role of a judge. Although the newscast did not identify Mohr by name, it identified KIS and displayed its storefront.
*771 ¶ 4 The day after the initial newscast, Mohr went to work and found three voice mail messages from KXLY viewers who were very upset about his treatment of Burson. Upon receiving approximately 30 similar calls, Mohr scheduled an interview with Grant for that afternoon. During the interview, which lasted about 30 minutes, Mohr explained that Burson had attempted to wash the KIS windows numerous times in the past year and one-half; he asked Burson to stop because he already had a window cleaner, and Burson's efforts smeared the windows; Burson made many threats of violence against Mohr and his wife; and he was very concerned for the safety of his wife, his customers, and himself. Mohr also explained that he did not have anything against Burson or people with Down's syndrome and that he tried to drop the charges against Burson.
¶ 5 KXLY aired a follow-up broadcast on November 17, 1998. It began with a description of the events leading to Burson's arrest:
MS. MISHIMA: As news 4 reported last night Glen Burson went to Kitchen Interiors Showcase in the Spokane Valley last April. Burson says he simply asked for some candy but it ended up with some pushing and shoving, leading to Burson's arrest. Burson who had the mental ability, has the mental ability of a 5 year old describes what happened.
MR. GLEN BURSON: He got my arm. Okay. He did that. Then he started to hit me. "Go away." I am not like that.
CP at 120. It then discussed Mohr's side of the story:
MS. MISHIMA: Eliot Mohr, owner of kitchen [sic] Interiors Showcase, declined to discuss the matter prior to the story but since it aired last night he has changed his mind. And he says that Glen came to the store on several occasions and threatened to "Put a bullet in his head," and he says he was afraid for his wife's safety.
MR. MOHR: All I've been trying through all of this is to please have him restrained from being on this property because I was in fear that he could come in when I am not here, and if he had access to a gun or knife or something, that he might be able to do harm to my wife or, Heaven forbid, kill her.
CP at 120-21. In the final segment of the newscast, the newscaster noted that Mohr asked the prosecutor's office whether he could drop the charges against Burson, but was told it was not possible. The newscast identified Mohr and KIS by name and displayed the KIS storefront.
¶ 6 KXLY ran a third newscast on November 18, 1998. Burson's employer commented on Burson's nonviolent nature. Mohr explained that he attempted to drop the charges against Burson. The newscast identified Mohr and KIS by name and displayed the KIS storefront.
¶ 7 KXLY ran a final newscast on December 31, 1998. The newscaster explained that the court found Burson incompetent to stand trial and dismissed all charges. The newscast did not identify Mohr or KIS by name but it displayed the KIS storefront.

II. PROCEDURAL HISTORY
¶ 8 Mohr filed a defamation claim[2] against KXLY and Grant, alleging that the November 16, 1998, November 17, 1998, and December 31, 1998, newscasts were defamatory because they contained false statements and omitted material facts. The complaint alleged:
Grant, while acting in the course and scope of his employment as a KXLY employee and KXLY were negligent and acted recklessly when they failed to describe as part of these telecasts the previous incidents and threats that had been made by Burson. Said negligence and reckless conduct constitute defamation, the omission of material facts and is libel by implication by KXLY and Grant regarding the reason Glen Burson was arrested.

CP at 11 (emphasis added).
¶ 9 KXLY and Grant sought summary judgment because the newscasts were substantially *772 true, and they did not act negligently or with actual malice. Mohr responded that the sting of the newscasts was false and that KXLY and Grant acted with negligence.
¶ 10 Mohr also sought partial summary judgment that the newscasts contained false statements and Mohr is a private person. KXLY and Grant responded that the newscasts contained no false statements. In addition to his own affidavit, Mohr filed a statement by the Spokane County Prosecutor's Office[3] and the declaration of Greta Boyer, a KXLY viewer.[4]
¶ 11 The trial court granted Mohr's cross motion for summary judgment in part, finding that Mohr was "neither a public nor a vortex public figure." CP at 188. It denied Mohr's motion in part, finding that KXLY and Grant did not publish false statements. However, the trial court granted KXLY and Grant's motion for summary judgment, finding that the newscasts did not contain false statements and were substantially true. Mohr appealed. Mohr v. Grant, 117 Wash.App. 75, 68 P.3d 1159 (2003).
¶ 12 The Court of Appeals affirmed that the newscasts did not contain false statements but reversed because, "Mr. Mohr presented sufficient evidence to defeat summary judgment on the issue of whether material omissions rendered the otherwise true story false and defamatory with respect to Mr. Mohr." Id. at 88, 68 P.3d 1159. We accepted discretionary review. Mohr v. Grant, noted at 150 Wash.2d 1032, 84 P.3d 1229 (2004).

III. ISSUE
¶ 13 Whether otherwise true statements created a false impression by omission of material facts and therefore resulted in defamation by implication?

IV. ANALYSIS
¶ 14 "We review an order of summary judgment de novo and perform the same inquiry as the trial court." Mulcahy v. Farmers Ins. Co. of Wash., 152 Wash.2d 92, 95 P.3d 313, 316 (2004). Summary judgment is proper if the evidence viewed in a light most favorable to the nonmoving party shows there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c). "[C]onstruing the evidence in the light most favorable to the nonmoving party, the court asks whether a reasonable jury could find in favor of that party." Herron v. KING Broad. Co., 112 Wash.2d 762, 767-68, 776 P.2d 98 (1989).
¶ 15 Our court has recognized that summary judgment plays a particularly important *773 role in defamation cases: "`Serious problems regarding the exercise of free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits are allowed to proceed to trial. The chilling effect of the pendency of such litigation can itself be sufficient to curtail the exercise of these freedoms.'" Mark v. Seattle Times, 96 Wash.2d 473, 485, 635 P.2d 1081 (1981) (quoting Tait v. KING Broad. Co., 1 Wash.App. 250, 255, 460 P.2d 307 (1969)).[5]
¶ 16 To survive a defense motion for summary judgment, a defamation plaintiff must allege facts that would raise a genuine issue of fact for the jury as to each element. Mark, 96 Wash.2d at 486, 635 P.2d 1081. The elements a plaintiff must establish in a defamation case are falsity, an unprivileged communication, fault, and damages. Herron, 112 Wash.2d at 768, 776 P.2d 98; Bender v. City of Seattle, 99 Wash.2d 582, 599, 664 P.2d 492 (1983); Mark, 96 Wash.2d at 486, 635 P.2d 1081; Alpine Indus. Computers, Inc. v. Cowles Publ'g Co., 114 Wash.App. 371, 378, 57 P.3d 1178, 64 P.3d 49 (2002); Clardy v. Cowles Publ'g Co., 81 Wash.App. 53, 57, 912 P.2d 1078 (1996); Camer v. Seattle Post-Intelligencer, 45 Wash.App. 29, 36, 723 P.2d 1195 (1986).
¶ 17 Case law is unclear as to whether a private plaintiff[6] facing a defense motion for summary judgment must make a prima facie showing of all of the elements of defamation with convincing clarity or by a preponderance of the evidence.[7] This case does not require us to clarify the issue because the parties before the Court of Appeals agreed that the evidentiary standard is preponderance of the evidence.[8] The preponderance of the evidence standard requires that the evidence establish the proposition at issue is more probably true than not true. In re Welfare of Sego, 82 Wash.2d 736, 739 n. 2, 513 P.2d 831 (1973).
¶ 18 Even under the preponderance of the evidence standard, Mohr has failed to meet his burden as to falsity  the first element of defamation. Falsity in a classic defamation case is a false statement. We are not presented with a classic defamation case because the Court of Appeals upheld the trial court's determination on summary judgment that the newscasts contained no false statements. Mohr did not cross-appeal so that issue is not before us. RAP 13.7(b). The Court of Appeals focused on material omissions and concluded that Mohr could proceed to trial because the broadcasts could be found to have had a more "negative effect" or been "more damaging" due to the omission of *774 certain facts that may have portrayed Mohr as "less arbitrary and insensitive." Mohr, 117 Wash.App. at 86, 88, 68 P.3d 1159.
¶ 19 Instead of focusing on material omissions as a new type of defamation, we ask whether under these facts there can be defamation by implication and, if so, what is the proper standard? Questions of law are reviewed de novo. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 880, 73 P.3d 369 (2003).
¶ 20 Defamation by implication occurs where "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts." PROSSER AND KEETON ON THE LAW OF TORTS 116, at 117 (W. Page Keeton ed., 5th ed.1984, Supp.1988) (footnote omitted). Although the Court of Appeals stated that "[n]o Washington case directly addresses the problem of material omissions," Mohr, 117 Wash.App. at 85, 68 P.3d 1159, this court has recognized instances of defamation by implication.[9]
¶ 21 We used implication language in Chase v. Daily Record, Inc., 83 Wash.2d 37, 515 P.2d 154 (1973). Chase, a port commissioner, was asked to repay funds he received for a trip he never took. Id. at 38, 515 P.2d 154. When Chase learned that the defendant intended to print an article on the repayment matter, he issued a statement explaining that he had not received funds for a trip he did not take. Id. The defendant printed the article but omitted Chase's assertion that he never received money for a trip he never took. Id. at 38-39, 515 P.2d 154. The trial court granted the defendant's motion for summary judgment and the Court of Appeals affirmed. Id. at 40, 515 P.2d 154. We reversed, finding that Chase presented sufficient evidence as to falsity and fault. Id. at 45, 515 P.2d 154. As to falsity, we stated, "[t]he article, taken as a whole, leaves the reader with the clear implication of defalcation of public port monies by a public official," id. at 44, 515 P.2d 154, and the "use of the word `repayment' carries a possible implication of an improper receipt and use of public funds and subsequent repayment." Id. at 45, 515 P.2d 154.
¶ 22 In another case, we used implication language in establishing the negligence standard for defamation cases:
[A] private individual, who is neither a public figure nor official, may recover actual damages for a defamatory falsehood, concerning a subject of general or public interest, where the substance makes substantial dangers to reputation apparent, on a showing that in publishing the statement, the defendant knew or, in the exercise of reasonable care, should have known that the statement was false, or would create a false impression in some material respect.

Taskett v. KING Broad. Co., 86 Wash.2d 439, 445, 546 P.2d 81 (1976) (some emphasis omitted). *775 We repeated this implication language in Mark, 96 Wash.2d at 483, 635 P.2d 1081.
¶ 23 We also used implication language in Herron. There, the defendant published an article falsely asserting that Herron, a county prosecutor, received approximately half of his campaign contributions from bail bondsmen. Herron, 112 Wash.2d at 765, 776 P.2d 98. The trial court granted summary judgment for the defendant, finding no jury question was presented on the issue of falsity. Id. at 767, 776 P.2d 98. We reversed, finding that the statement that Herron received half of his campaign contributions from bail bondsmen "added a distinct and separate implication that Herron had bargained away his ethics and integrity in exchange for campaign contributions," id. at 772, 776 P.2d 98, and "implied that Herron had taken a bribe." Id. at 774, 776 P.2d 98.
¶ 24 This court has stated the plaintiff must show the statement is provably false, either in a false statement or because it leaves a false impression. See Chase, 83 Wash.2d at 38, 515 P.2d 154 (false statement); Herron, 112 Wash.2d at 774, 776 P.2d 98 (false statement); Mark, 96 Wash.2d at 496, 635 P.2d 1081 (false statement); Taskett, 86 Wash.2d at 445, 546 P.2d 81 (false statement and in dicta, "or would create a false impression in some material respect."); Schmalenberg v. Tacoma News, Inc., 87 Wash.App. 579, 590, 943 P.2d 350 (1997) ("Falsity can be express or implied.").
¶ 25 With respect to falsity, Washington does not require a defamation defendant to "prove the literal truth of every claimed defamatory statement." Mark, 96 Wash.2d at 494, 635 P.2d 1081. "A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the `sting', is true." Id."The `sting' of a report is defined as the gist or substance of a report when considered as a whole." Herron, 112 Wash.2d at 769, 776 P.2d 98. In applying this test, we require plaintiffs to show that the false statements caused harm distinct from the harm caused by the true portions of a communication:
Moreover, Mark has provided no evidence that the inaccurate statements caused him any further damage than has resulted from the conviction and sentence on a grand larceny charge. While we have considerable sympathy with Mark's wish to protect his reputation, we are of the opinion that the errors here under review did not materially add to the damage suffered by Mark by reason of the truthful publication of matters relating to the charge and conviction for grand larceny.
Mark, 96 Wash.2d at 496, 635 P.2d 1081 (footnote omitted). Stated another way, "[w]here a report contains a mixture of true and false statements, a false statement (or statements) affects the `sting' of a report only when `significantly greater opprobrium' results from the report containing the falsehood than would result from the report without the falsehood." Herron, 112 Wash.2d at 769, 776 P.2d 98 (quoting Mark, 96 Wash.2d at 496, 635 P.2d 1081).
¶ 26 In his briefing Mohr asserted (without citation) that the sting is a question for the jury. The Court of Appeals agreed, citing a case from another jurisdiction. Mohr, 117 Wash.App. at 86, 68 P.3d 1159 (citing Fleckenstein v. Friedman, 266 N.Y. 19, 23, 193 N.E. 537 (1934)). However, this court or the trial court, not the jury, determined the gist of reports in at least two seminal defamation cases. See Herron, 112 Wash.2d at 769-70, 776 P.2d 98; Mark, 96 Wash.2d at 495-96, 635 P.2d 1081.
¶ 27 The parties disagree about the gist or the sting of the newscast. Mohr asserted that the gist of the newscast was "that Eliot Mohr caused the arrest of a developmentally disabled individual because the individual came into Eliot Mohr's store to ask for candy." He states this leaves a false impression. Answer of Eliot Mohr and Mohr & Co., Inc. to Br. of Amici Curiae at 2. Grant asserted that "[t]he gist of the story ... [was] that the County was using taxpayer resources to prosecute a developmentally disabled man, based on charges brought by the owners of the Kitchen Interior Showcase business." CP at 149.
¶ 28 Mohr argues that his actions would be more understandable or sympathetic if omitted facts had been included. The Court of *776 Appeals in reversing stated, "[w]e cannot say that no reasonable jury could find that the omitted facts would have placed the events of April 30 in a context in which the Mohrs' conduct would appear less arbitrary and insensitive than in the story as broadcast." Mohr, 117 Wash.App. at 88, 68 P.3d 1159. Arbitrariness and insensitivity are not the test. What is necessary is a provably false impression which is contradicted by inclusion of omitted facts. Even adopting Mohr's gist, the inclusion of the facts of the prior history between Burson and Mohr that were known or reasonably known to Grant would not necessarily contradict the alleged false impression.
¶ 29 To survive a defendant's motion for summary judgment, a plaintiff must make a prima facie showing as to all the defamation elements. Mark, 96 Wash.2d at 486, 635 P.2d 1081. In a defamation by omission case, the plaintiff must show with respect to the element of falsity that the communication left a false impression that would be contradicted by the inclusion of omitted facts. Merely omitting facts favorable to the plaintiff or facts that the plaintiff thinks should have been included does not make a publication false and subject to defamation liability. The Fifth Circuit rejected a defamation plaintiff's claim that a news report was misleading because the broadcaster did not include all the potentially relevant information about the plaintiff. Green v. CBS Inc., 286 F.3d 281 (5th Cir.2002). The Green court found that since "CBS accurately reported the facts, albeit not all of the facts, whether or not the story painted [the plaintiff] in an attractive light is irrelevant." Id. at 285. The court held that even though including more facts would have led to a more balanced report, the broadcast did not create a false impression and thus was not defamatory. Id.; see also Peter Scalamandre & Sons, Inc. v. Kaufman, 113 F.3d 556, 563 (5th Cir.1997) (omission of footage that would have portrayed subject in a more favorable light insufficient to establish actionable falsity because it "is common knowledge television programs ... shoot more footage than necessary and edit the tape they collect down to a brief piece."); Janklow v. Newsweek, Inc., 759 F.2d 644, 648 (8th Cir.1985) (rejecting claim to hold magazine liable "for omission of those additional facts that [the plaintiff] believes should have been published, but whose omission did not make what was unpublished untrue"), aff'd on reh'g, 788 F.2d 1300 (1986); UTV of San Antonio, Inc. v. Ardmore, Inc., 82 S.W.3d 609, 613 (Tex.Ct.App.2002) (no defamatory false impression where television report omitted facts favorable to plaintiff).
¶ 30 A prime example of defamation by implication caused by certain material omissions is found in the case of Memphis Publishing Co. v. Nichols, 569 S.W.2d 412, 419 (Tenn.1978). There, the Tennessee Supreme Court found that a newspaper's report that a woman shot her husband and another woman after finding them together in the second woman's living room was defamatory because its "clear implication" was that the two were having an affair. Id. The report omitted the fact that the two were not alone and that several others were in the same room during the wife's attack. The court stated, "[t]he proper question is whether the meaning reasonably conveyed by the published words is defamatory, `whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" Id. at 420 (quoting Fleckenstein, 266 N.Y. at 23, 193 N.E. 537). In applying this rule, the court held that "[t]he publication of the complete facts could not conceivably have led the reader to conclude" that the plaintiff was having an affair. Id. at 419-20. In Nichols, the implication was clear and it was false. The omitted information would have negated the defamatory implication in its entirety.
¶ 31 Here, the omitted information would not have negated the asserted defamatory implication in its entirety. Mohr argues that the November 16, 1998, November 17, 1998, and December 31, 1998, newscasts caused a clear false implication based on Boyer's declaration and the statement from the Spokane County Prosecutor's Office. His reliance on these documents is misplaced for two reasons. First, both documents are based solely *777 on the November 16, 1998, newscast.[10] The subsequent newscasts negated any such impression because they reported Mohr's side of the story, along with many of the facts mentioned in Boyer's declaration and the statement of the Spokane County Prosecutor's Office. In the November 17, 1998, newscast, for example, a reporter explained that Burson came to KIS on several occasions, Burson threatened to put a bullet in Mohr's head, and Mohr was concerned for his wife's safety. Mohr also explained that his goal was to have Burson merely restrained from coming to KIS because he was afraid that Burson might harm his wife. In the closing segments, a reporter noted that Mohr asked whether he could drop the charges against Burson but was told that it was not possible.
¶ 32 Second, Mohr's reliance on Boyer's declaration and the statement of the Spokane County Prosecutor's Office is misplaced because both documents rely on events that Grant was unaware of at the time of the first newscast. Before the first newscast aired, Grant contacted the prosecutor working on the case, her supervisor, and Mohr, but they all refused to discuss the case. Accordingly, the only information Grant had, and the only information we can reasonably find him accountable for, is the information contained in the court file, and interviews he was able to conduct. Those sources did not reveal many of the events referenced in Boyer's declaration and the statement of the Spokane County Prosecutor's Office. They did not state that Burson attempted to strike Mohr one year before the arrest, did not explain that Burson physically attacked Mohr's truck, and did not reveal seven or eight incidents in which Burson came to KIS and became confrontational.
¶ 33 Mohr has not made a prima facie showing that the communication left a false impression that would be contradicted by the inclusion of omitted facts.[11] Furthermore, the Court of Appeals' standard of "less arbitrary and insensitive" is not the correct test by which to measure defamation by implication caused by omitted facts.

V. CONCLUSION
¶ 34 Mindful of the competing interests underlying defamation cases, we reverse the Court of Appeals and reinstate the trial court's granting of summary judgment to KXLY and Grant because Mohr has not made a threshold showing of defamation by implication because he did not show falsity.
SANDERS and OWENS, JJ.
ALEXANDER, C.J., (concurring).
¶ 35 I agree with the majority that the Court of Appeals should be reversed. I write separately in order to disassociate myself from the majority's apparent recognition of a tort of defamation by implication "caused by certain material omissions." Majority at 776. There is no Washington authority that supports the recognition of defamation by omission, and we should not recognize such a cause of action now.
¶ 36 In my view, only words can defame, and they can do so directly or by implication. The absence of words, however, can never defame. Therefore, I think it would have been sufficient for the majority to say that there was nothing in the news report on KXLY-TV that defamed Mohr directly or by *778 implication. The discussion about defamation by material omission should have been omitted by the Court of Appeals and this court.
C. JOHNSON and MADSEN, JJ.
CHAMBERS, J., (concurring in part and dissenting in result).
¶ 37 Analytically, I agree generally with the majority's assessment of the law of defamation as it relates to nonpublic figures. I part company from the majority on whether, in this case, a judge or jury should decide if the "gist" or "sting" of the story is false.
¶ 38 At common law in Washington State, liability existed for defamation so long as the plaintiff demonstrated that the statements complained of were (1) false, (2) defamatory, and (3) published. See Taskett v. KING Broad. Co., 86 Wash.2d 439, 458, 546 P.2d 81 (1976) (Horowitz, J., dissenting). The defendant, however, could raise two affirmative defenses: truth or privilege. Taskett, 86 Wash.2d at 458, 546 P.2d 81; see also PROSSER AND KEETON ON THE LAW OF TORTS 802, 815 (W. Page Keeton ed., 5th ed.1984).
¶ 39 In 1964 the United States Supreme Court concluded that the First Amendment to the United States Constitution gave a higher degree of protection to free speech than was consistent with common law defamation. New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Under New York Times, a public official may not recover damages for defamation unless "actual malice" (which includes knowledge or reckless disregard of the falsity of the alleged defamatory statement) is proved. New York Times, 376 U.S. at 280, 84 S.Ct. 710. The Supreme Court drew a large circle around speech to protect the right to speak freely; however, certain defamatory speech fell outside the circle of protection.
¶ 40 Since New York Times, courts have struggled to balance the First Amendment rights of the press with the appropriate protection of private individuals harmed by false and irresponsible reporting. In Gertz, the Court articulated the appropriate approach when a private person brings a defamation action against a publisher. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court concluded that the First Amendment did not require a private person to show actual knowledge of falsehood, or even mere recklessness to the truth, before an injury to reputation caused by negligent publishing could be redressed in a defamation suit. Gertz, 418 U.S. at 342, 347-48, 94 S.Ct. 2997. Accordingly, the Supreme Court reinstated a jury verdict in a defamation action brought by an attorney against a national newspaper. Gertz, 418 U.S. at 329, 332, 94 S.Ct. 2997.
¶ 41 In Gertz, the newspaper had published a story asserting the attorney was part of a worldwide communist conspiracy to destroy local police and substitute a national police force as part of an alleged planned communist take over of the United States. However, the article was a flight of fancy, apparently rooted in the bare fact that the attorney represented a family in a wrongful death action against a police officer who had been convicted of murder. Gertz, 418 U.S. at 325-27, 94 S.Ct. 2997. While the attorney could not prove that the publisher had actual malice (since the publisher said he accepted the article without checking any of the facts), he could prove that the allegations were patently false and published negligently. The Supreme Court concluded that the First Amendment did not require a private person to prove actual malice to prevail. See Gertz, 418 U.S. at 347, 94 S.Ct. 2997.
¶ 42 In the absence of an actual malice standard, courts and legislatures have articulated a variety of standards perceived necessary to balance the interests of a free and vigorous news media against the individual's right to be free from false and defamatory reports. This court articulated the governing principles in Mark v. Seattle Times, 96 Wash.2d 473, 635 P.2d 1081 (1981).
¶ 43 Mark, a case similar to the one before us today, involved the reporting by Seattle media on charges concerning Medicaid fraud. Mark, 96 Wash.2d at 476, 635 P.2d 1081. The media, which had been invited to a press conference by the prosecutor, reported the fraud indictment and trial widely, and relied in part upon affidavits of probable cause and *779 other court documents. Mark, 96 Wash.2d at 476-81, 635 P.2d 1081. Mark, who was found guilty of Medicaid fraud after several of the widely publicized charges were dropped, brought a defamation action against several publishers. Mark, 96 Wash.2d at 476-82, 635 P.2d 1081. We concluded that a private person, resisting a defense motion for summary judgment in a defamation case, must establish a prima facie case by convincing clarity. Mark, 96 Wash.2d at 487, 489, 635 P.2d 1081. This heightened standard is the concession defamation law makes to the First Amendment. See Mark, 96 Wash.2d at 485, 635 P.2d 1081. I do not read the majority to alter that standard.[1] Once falsity is established by convincing clarity, the burden is upon the media defendant to "show that the statement is substantially true or that the gist of the story, the portion that carries the `sting', is true." Mark, 96 Wash.2d at 494, 635 P.2d 1081 (citing WILLIAM L. PROSSER, THE HANDBOOK OF THE LAW OF TORTS 798 (4th ed.1971)); Taskett, 86 Wash.2d at 443, 546 P.2d 81 (statement defamatory only if the "substance of the statement" is likely to harm a reputation).[2]
¶ 44 I agree with my colleagues that falsity may be established by implication and that the omission of facts may result in defamation by implication. See majority at 774, 776. But I agree with the Court of Appeals that Eliot Mohr points to numerous discrete historical facts which, if believed, could lead a trier of fact to conclude that KXLY-TV knew and purposely omitted facts from its story that slanted coverage. Under the story told by KXLY, it appeared that a developmentally challenged man wandered into Mohr's store seeking to wash windows, and Mohr's response was to assault the man and prosecute him for criminal trespass and harassment. See Mohr v. Grant, 117 Wash.App. 75, 86, 68 P.3d 1159 (2003); cf. majority at 769-70 n. 1. If the facts relied upon by Mohr are believed, he would have established the element of falsity by convincing clarity. The burden would then shift to KXLY to establish that the gist or sting of the story was true. Mark, 96 Wash.2d at 494, 635 P.2d 1081. I disagree with the majority that this is a question of law when reasonable minds can differ. Contra majority at 775.
¶ 45 KXLY does not show, as a matter of law, that the gist of this story was true. It does not meet its burden. KXLY relies only on the truth of the factual statements made to argue that its reports were factually accurate, even in their implications. Mohr's evidence is sufficient to defeat summary judgment on the issue of whether material omissions rendered the otherwise true story false and defamatory, and KXLY has failed to show that the gist or sting of the story was true.
¶ 46 Accordingly, I would affirm the Court of Appeals and reverse summary judgment. While I largely agree with the majority's articulation of the governing principles, I respectfully dissent in result.
BRIDGE, J., and IRELAND, J.P.T.
NOTES
[1] The incident history and incident reports reflected three complaints made by Mohr and his wife Louise. On October 9, 1997, Louise complained that Burson came to KIS, wanted to take a picture of her, got very aggressive, called her names, made assault threats, and refused to leave. Louise told the responding officer that Burson visited KIS on a regular basis and bothered people. She requested that an officer tell Burson to stop coming to KIS. An officer found Burson near his home. The officer advised Burson that the Mohrs did not want him cleaning their windows and that he could be arrested for criminal trespass if he returned to KIS. Burson stated he understood he could go to jail. The officer entered the call into the incident history but did not prepare an incident report or cite or arrest Burson.

On January 8, 1998, Mohr complained that he saw Burson cleaning the KIS windows when he pulled into the KIS parking lot. When Mohr turned his headlights on Burson, Burson rode away on his bicycle. Mohr saw signs that Burson had cleaned his windows several times since October, but this was the first time he actually saw Burson cleaning the windows. The incident report noted that Burson had cleaned the windows several times in the past and that Mohr had told him many times not to do so because his efforts smudged the windows. The incident history states that Burson has trespassed in the past, refers to him as "the retarded person who goes around washing windows with out permission," and who has "threatened [Mohr's] life." Clerk's Papers (CP) at 50. The incident report characterized Burson's actions as second degree criminal trespass, but the responding officer did not cite or arrest Burson.
On April 30, 1998, Mohr complained that Burson entered the KIS showroom and ignored requests that he leave. When Louise said she was going to call the police, Burson said he did not care, and he was "going to get even." CP at 48. Burson went outside, threw his bicycle on the ground, made slashing motions across his throat, and reentered the KIS showroom. Mohr again told him to leave. When the responding officer arrived, the Mohrs explained that Burson previously threatened to put a bullet in Mohr's head, they were alarmed and frightened by Burson's threats, and they were uncertain what Burson might do. Burson said he knew he should not be at KIS, and he threatened the Mohrs because he was mad. The officer arrested Burson, cited him with harassment and first degree trespass, drove him home, and filed an incident report.
[2] His complaint also included a false-light invasion of privacy claim which Mohr subsequently waived.
[3] The prosecutor's office issued a statement on November 17, 1998, asserting:

It is unfortunate that this case, which is far from being resolved, has become distorted by a news-report which can only be characterized as one-sided. Had the report accurately noted the underlying facts of the charge, including the death threats involving the use of a gun, perhaps the fears of the victims and the concerns of the prosecutor's office about public safety would have been better shown.
CP at 176-77.
[4] Boyer visited KIS on November 17, 1998, and spoke with Mohr in order to determine why he feared a person with Down's syndrome. According to her affidavit, Boyer's discussion with Mohr left her with a different impression:

8. When I arrived a[t] Kitchen/Interior Showcase I learned a much different account of the events that lead to the arrest of Mr. Burson. I learned immediately that my impression from the November 16, 1998 telecasts were false. I learned that Mr. Mohr did not have a fear of Down's Syndrome but that he was emotionally torn between restraining Mr. Burson from his property and protecting his and his wife's personal safety. I learned of the numerous threats Mr. Burson had made against Mr. Mohr including the threats to put a bullet in his head, to cut his throat, to kill him, and to get even. I learned that Mr. Burson had attempted to strike Mr. Mohr just over one year earlier, and that Mr. Burson had physically attacked Mr. Mohr's truck on a prior occasion.
9. I was surprised to learn that the Mohrs had contacted the sheriff's department with regard to Mr. Burson's threats on two prior occasions in 1997 and 1998, neither of which resulted in arrest. I was surprised to learn that Mr. Burson was trespassed from [sic] the business property by the sheriff's department, but that he returned on April 30, 1998, nonetheless. KXLY and Tom Grant's omission of these facts created a false impression in my mind. Had I been privy to the actual history between the [sic] Glen Burson and the Mohr's [sic] I would not have been so upset with Eliot Mohr.
CP at 158.
[5] Competing interests underlie all defamation cases. The protection of First Amendment freedoms of speech and press compete with the protection of an individual's reputation via state defamation law. The United States Supreme Court articulated the tension between these interests in cases involving public issues, for example, as follows:

[Cases of the Court] establishing First Amendment protection for defendants in defamation actions surely demonstrate the Court's recognition of the Amendment's vital guarantee of free and uninhibited discussion of public issues. But there is also another side to the equation; we have regularly acknowledged the "important social values which underlie the law of defamation," and recognized that "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation." Rosenblatt v. Baer, 383 U.S. 75, 86[, 86 S.Ct. 669, 676, 15 L.Ed.2d 597] (1966).
Milkovich v. Lorain Journal Co., 497 U.S. 1, 22, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). We are mindful of these competing interests as we consider the issues presented by this case.
[6] The parties have not sought review of the trial court's characterization of Mohr as a private plaintiff. RAP 13.7(b).
[7] Compare Mark, 96 Wash.2d at 487, 635 P.2d 1081 (requiring a private plaintiff facing defense motion for summary judgment to show a prima facie case of defamation by evidence of convincing clarity), with Richmond v. Thompson, 130 Wash.2d 368, 385-86, 922 P.2d 1343 (1996) (stating that only a public plaintiff must prove actual malice by clear and convincing evidence).
[8] After submission of the briefs to the Court of Appeals, which did not have oral argument, but before issuance of its opinion in this case, the same Court of Appeals issued Alpine Industries, 114 Wash.App. at 392-93, 57 P.3d 1178, in which it articulated that the actual malice standard applies when a private figure is allegedly defamed by a statement pertaining to a matter of public concern. Given the agreement on the evidentiary standard, the parties necessarily did not make this argument below nor are they making it before this court. We save for another day our review of this issue.
[9] Similarly, while the United States Supreme Court has not explicitly recognized defamation by implication, the Court pointed toward its actionability in Milkovich, 497 U.S. at 18-19, 110 S.Ct. 2695. In Milkovich, the respondent published an article implying that the petitioner lied under oath during a judicial proceeding. 497 U.S. at 3, 110 S.Ct. 2695. The Court characterized the issue as "whether a reasonable factfinder could conclude that the statements in the [article] imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding." Id. at 21, 110 S.Ct. 2695. The Court answered this question affirmatively, stating, "[t]his is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression." Id.

At least one federal court and one state court have relied on Milkovich for the proposition that the United States Supreme Court recognizes defamation by implication. See Toney v. WCCO Television, Midwest Cable & Satellite, Inc., 85 F.3d 383, 394 (8th Cir.1996) (reversing summary judgment for defendant, remanding for a new trial, and stating "Milkovich made clear that implications, like plain statements, may give rise to a defamation claim. Indeed, Milkovich ultimately held that `a reasonable fact finder could conclude that the statements [at issue] imply an assertion that petitioner Milkovich perjured himself ... [and that] th [is] connotation is sufficiently factual to be susceptible of being proved true or false' "(alterations in original) (quoting Milkovich, 497 U.S. at 21, 110 S.Ct. 2695)); Mach v. Allison, 259 Wis.2d 686, 698-99, 656 N.W.2d 766 (2002) (reversing summary judgment for the defendant in part, remanding for a new trial in part, and citing Milkovich for the proposition that "[t]he statement that is the subject of a defamation action need not be a direct affirmation, but may also be an implication.").
[10] See CP at 156 (Boyer stating, "I was personally offended and extremely upset after watching the November 16, 1998 telecasts. My impression from the November 16, 1998 newscast was that ..."); CP at 158 (Boyer stating, "I immediately learned that my impressions from the November 16, 1998, telecasts were false."); CP at 176 (Spokane County Prosecutor's Office stating, "[i]t is unfortunate that this case, which is far from being resolved, has become distorted by a news-report which can only be characterized as one-sided.").
[11] Because Mohr failed to show falsity, we do not determine whether he established the remaining elements of defamation. See Mark, 96 Wash.2d at 496-97, 635 P.2d 1081 (refusing to analyze the remaining elements of defamation because Mark failed to establish falsity and unprivileged communication). We note that KXLY and Grant only contested falsity and fault. KXLY and Grant did not assert a privilege and did not claim there were not damages. Media amici raise the fair reporting privilege but we do not consider an issue raised only by amicus and not asserted by the parties. See RAP 2.5(a).
[1] The majority correctly notes in this case the appellant and the respondent agreed that the standard for a private person alleging defamation is to prove falsity by a preponderance of evidence, giving us no occasion to decide definitively the deeper standards question. Majority at 773.
[2] However, the media has no duty to independently verify information contained in court documents. Mark, 96 Wash.2d at 493, 635 P.2d 1081.