[No. 66868-4-I. Division One. January 14, 2013.]

UNITED STATES MISSION CORPORATION, *Appellant*, v. KIRO TV, INC., *Respondent*.

*James E. Lobsenz* and *Lydia A. Zakhari* (of *Carney Badley Spellman PS*), for appellant.

*Bruce E.H. Johnson* and *Ambika K. Doran* (of *Davis Wright Tremaine LLP*), for respondent.

*Jessica L. Goldman* and *Gregg P. Leslie* on behalf of Reporters Committee for Freedom of the Press, the Washington Newspaper Publishers Association, and Allied Daily Newspapers of Washington, amici curiae.

¶1 GROSSE, J. — Falsity is an element of a common law claim of defamation. But, a defendant against whom a defamation claim is asserted need not prove the literal truth of every defamatory statement. Rather, to prevail, a defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the "sting," is true. Here, the gist of the two stories KIRO TV Inc. broadcast and published on its web site about United States Mission Corporation (US Mission) is true, even though some statements, such as that US Mission "recruited" felons and sent "bevies" of felons into neighborhoods, may not be true. Accordingly, we affirm the trial court.

## FACTS

¶2 In February 2010, KIRO broadcast on television and published on its web site a story authored by KIRO investigative reporter Chris Halsne. The story is entitled "Jailhouse Used To Find Door-To-Door Solicitors" and begins, "A

transitional housing service in Seattle [US Mission] has been sending a bevy of historically violent felons, burglars and robbers to your house to collect money -- and there isn't a thing you can do about it." The story describes how US Mission was included on a list of places where inmates released from the King County jail could look for housing. It also describes how, under a "pay-to-stay" plan, residents of US Mission houses are required to solicit money door-to-door in order to remain living at the houses: "Operators typically load up a van-full of recent transients and known criminals, then drop them off in various neighborhoods. They are required to collect cash and checks to keep a roof over their heads." The story states that some residents of US Mission are felons and also reports comments from persons who have had US Mission residents solicit money at their homes.

¶3 In March 2010, KIRO broadcast and published a follow-up story, also written by Chris Halsne, with the headline "Homeless Charity Mandates Panhandling, Takes Big Cut." The story begins, "A KIRO Team 7 Investigation into door-to-door fund raising by the United States Mission prompts King County to sever ties with the program. But the charity's troubles might not end there." In the story, Halsne writes that what "really caught [KIRO's] attention" were "the multiple 'disturbance' visits by police, dealing with the expulsion of house members" who failed to solicit enough money each day to remain in a US Mission house. The story also states that the investigators "discovered the kinds of guys coming to your door are basically the kind right out of jail. Public records show house guests with records for assault, rape, kidnapping, attempted arson, and residential burglary."

¶4 In August 2010, US Mission filed a complaint for defamation against KIRO. In October 2010, KIRO filed an answer and a motion to strike the complaint. The motion to strike was based on two alternative grounds—the anti-

SLAPP[1] statute and CR 12(c). KIRO sought an award of attorney fees and a $10,000 penalty under the anti-SLAPP statute.

¶5 In February 2011, the trial court granted KIRO's motion to dismiss under CR 12(c) and dismissed US Mission's complaint with prejudice. In its order of dismissal, the court stated, "The Court does not find it necessary to make any ruling on the defendant's motion to strike pursuant to RCW 4.24.525 and thus the Court does not address that alternate motion." US Mission filed a motion for reconsideration, and the trial court denied that motion. US Mission appeals the striking of its complaint, and KIRO cross appeals the trial court's failure to award it attorney fees and the statutory penalty.

## ANALYSIS

### I. *Standard of Review*

■ ¶6 We must consider a motion for judgment on the pleadings under CR 12(c) as a motion for summary judgment under CR 56 if the trial court considers matters outside the pleadings in making its decision.[2] Here, in deciding KIRO's CR 12(c) motion, the trial court considered matters outside the pleadings. Accordingly, we review the trial court's order granting the motion using the de novo standard under which we review orders granting summary judgment. Summary judgment is properly granted where no genuine issues of material fact exist and the moving

---

[1] Strategic lawsuit against public participation; RCW 4.24.525.

[2] *Lobak Partitions, Inc. v. Atlas Constr. Co.*, 50 Wn. App. 493, 503, 749 P.2d 716 (1988). CR 12(c) provides:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by rule 56.

party is entitled to judgment as a matter of law.[3] Facts are viewed and inferences are taken in the light most favorable to the nonmoving party.[4]

## II. *Common Law Defamation*

 ¶7 To establish a prima facie claim of defamation, a private plaintiff must show falsity, unprivileged communication, fault, and damages.[5] To prevail in a defamation action, "[t]he defamatory character of the language must be apparent from the words themselves."[6] Where language is ambiguous, "resolution in favor of a 'disparaging connotation' is not justified."[7] A defamation claim may not be based on the negative implication of true statements.[8] This is because "[d]efamatory meaning may not be imputed to true statements."[9]

 ¶8 The element primarily at issue in this case is falsity. "Falsity in a classic defamation case is a false statement."[10] In a defamation by implication case, the plaintiff must show that the statement at issue is provably false, either because it is a false statement or because it leaves a false impression.[11]

---

[3] *Fiore v. PPG Indus., Inc.*, 169 Wn. App. 325, 333, 279 P.3d 972 (2012), *review denied*, 175 Wn.2d 1027 (2012).

[4] *Jackowski v. Borchelt*, 174 Wn.2d 720, 729, 278 P.3d 1100 (2012).

[5] *Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005).

[6] *Lee v. Columbian, Inc.*, 64 Wn. App. 534, 538, 826 P.2d 217 (1991).

[7] *Lee*, 64 Wn. App. at 538 (quoting *Exner v. Am. Med. Ass'n*, 12 Wn. App. 215, 219, 529 P.2d 863 (1974)).

[8] *Yeakey v. Hearst Commc'ns, Inc.*, 156 Wn. App. 787, 792, 234 P.3d 332 (2010).

[9] *Yeakey*, 156 Wn. App. at 792.

[10] *Mohr*, 153 Wn.2d at 823.

[11] *Mohr*, 153 Wn.2d at 825.

## A. *Gist or Sting of the Stories*

■ ¶9 In its complaint, US Mission alleges that KIRO's stories contain four false "gists" or "stings."[12] The gist or sting of a story is the story's substance when considered as a whole.[13]

■ ¶10 What constitutes the gist or sting of a story is a question for the court.[14] When considered as a whole, the gist of KIRO's stories is that US Mission is among the places to which recently released inmates from the county jail, including felons, are referred for transitional housing; that some of residents of US Mission are or have been persons with felony or nonfelony convictions; that residents of US Mission, including recently released inmates, are required to solicit donations in order to continue living there; and that US Mission takes residents into neighborhoods so they can solicit donations. US Mission does not deny the truth of these assertions. Brian Jones, US Mission's secretary-general, stated in a declaration that he was unaware that the mission was on the jail's referral list until he saw a copy of that list, but he did not deny that US Mission is on the list. He also acknowledged that residents engage in door-to-door fundraising. Jones admitted that US Mission does not "shun all people who have criminal records" and that some residents may have violent criminal histories and concealed that fact when applying to live there. He estimated that 10 percent of the residents have criminal convictions and 5 percent have felony convictions. Further, Jones is quoted in the story as saying, " 'People convicted of assault or another violent crime[,] we might take them with the approval of their parole officer.' "

---

[12] US Mission uses the term "thrust," but we assume that by "thrust," US Mission means "gist," as that term is used in *Mohr* and other defamation cases.

[13] *Mohr*, 153 Wn.2d at 825.

[14] *Mohr*, 153 Wn.2d at 826 (noting that either the appellate court or the trial court, not a jury, determined the gist of allegedly defamatory reports in both *Herron v. KING Broadcasting Co.*, 112 Wn.2d 762, 776 P.2d 98 (1989) and *Mark v. Seattle Times*, 96 Wn.2d 473, 635 P.2d 1081 (1981)).

¶11 In its complaint, US Mission characterizes the gist, or sting, of the stories differently and claims that four gists, as it characterizes them, are false. We disagree with US Mission's characterizations. It claims that one gist of the stories is that "United States Mission deliberately recruited violent criminals to solicit donations to the organization." But the gist of the stories is not that the Mission "deliberately" seeks out violent criminals for solicitation purposes. The gist is that some of US Mission's residents have prior felony convictions and that these residents, like all residents, engage in door-to-door solicitation.

¶12 Another alleged gist of the stories US Mission claims is false is that it "deliberately employs known criminals to solicit donations as a tactic because use of such people to solicit donations is an effective means of threatening people with harm if they do not contribute." There are no statements of fact in either story about US Mission using criminals to threaten people. One story contains a quotation from a "stay-at-home mom" who told an interviewer that she views persons coming to her door and asking her for donations as a threat. But this statement of opinion does not support US Mission's assertion that one gist of the story is that it uses criminals to threaten people into donating money.

¶13 US Mission alleges that another false gist of the stories is "that a significant proportion of its solicitors have criminal records as violent felons." The stories do not discuss the proportion of felons and nonfelons who live at US Mission and solicit donations. The substance of the stories is that an unspecified number of felons, including felons convicted of violent crimes, live or have lived at US Mission, not that a "significant proportion" of its solicitors are violent felons.

¶14 Finally, US Mission alleges that an allegedly false gist of the stories is that US Mission "falsely pretends to have a religious mission in order to escape government regulation." Again, we disagree that this is a gist of the

stories. One story states the following with regard to the religious aspect of US Mission's activities: "Right now, the Mission says the government can't regulate their door-to-door solicitation because of religious free speech. Seattle's licensing division has reportedly opened an investigation anyway." The same article contains a quote from a former resident that there were no religious aspects to US Mission during the time he lived there. The other story states, "United States Mission operators call their solicitors 'emissaries of Christ.' Homeowners in this neighborhood say nobody mentioned religion." The article also contains a statement, best characterized as a statement of opinion, that the fact that homeowners reported that none of the residents mentioned religion while soliciting "raises the question if this organization might be shrouding their panhandling in religious free speech. That prevents them from being regulated like other businesses going door to door." These are the only statements that mention religion in either article. Only the statement of opinion comes close to conveying that US Mission "pretends" to be a religious organization. But a statement of opinion cannot be defamatory.

## B. *Allegedly False Assertions*

¶15 In its complaint, US Mission alleges that several assertions in the stories are themselves false and therefore defamatory. We address only those assertions about which US Mission argues on appeal.

### 1. *"Reporter Chris Halsne goes undercover to reveal the motives and tactics of the United States Mission"*

¶16 US Mission argues that the term "undercover" gives the impression that US Mission had something to hide and that Halsne was forced to go undercover to reveal its secret. We disagree. The common and ordinary meaning of "to go undercover" is to engage in a secret investigation without the knowledge of the person or entity being investigated. This is what Halsne did with respect to his inves-

tigation of US Mission and its practice of accepting as residents persons with prior convictions and its practicing of sending these residents and residents with no prior convictions into neighborhoods to solicit donations. The statement that Halsne went undercover to investigate US Mission is not false. Whether this statement left a negative impression is of no relevance in terms of a defamation claim. "[A] plaintiff may not base a defamation claim on the negative implication of true statements."[15]

2. *"[A]fter getting out of prison for raping and kidnapping a stranger, [Ray] Demry moved into the U.S. Mission's Seattle home in late 2004 and lived there a full month"*

¶17 US Mission fails to include the fact that this sentence begins with "Police records show . . . ." The police record contains a certification for determination of probable cause of the release of this person showing that he lived in US Mission's Seattle home from at least September 30, 2004 until October 30, 2004. The statement in KIRO's article is not false.

3. *"Operators typically load up a van-full of recent transients and known criminals, then drop them off in various neighborhoods"*

¶18 US Mission does not dispute the fact that it drove its residents into neighborhoods so they could solicit donations. Nor does it dispute that some of its residents are persons with criminal convictions and/or transients. And it does not dispute that this is how it places its residents in neighborhoods. US Mission has not shown the falsity of this statement.

4. *Statements of residents interviewed by the KIRO reporter*

¶19 Paragraphs 3.10, 3.11, and 3.12 of US Mission's complaint refer to comments that appear in the first story

---

[15] *Yeakey*, 156 Wn. App. at 792.

made by residents who had US Mission residents solicit money at their homes. There is nothing in the record to suggest that KIRO made up these comments or misreported them, or that the speakers were lying. US Mission has not shown that these statements are false and, accordingly, has not shown that they are defamatory.

> 5. *"In addition to Ray Demry, police records show convicted rapist Willie Edward Wilson registered to live at the mission house in late 1998"*

¶20 A record from the King County Sheriff's Office shows that Wilson was convicted in November 1986 of second degree rape. A Seattle Police Department certificate for determination of probable cause, dated March 23, 2009, states that Wilson last registered with the King County Sheriff's Office in June 1998 and listed his address as the US Mission's Seattle house. This statement in KIRO's story is not false.

> 6. *"United States Mission operators call their solicitors 'emissaries of Christ.' Homeowners in this neighborhood say nobody mentioned religion"*

¶21 There is nothing in the record to prove or disprove the truth of the statement that the US Mission refers to its solicitors as emissaries of Christ. The secretary-general stated in his declaration that US Mission is a religious service organization. Its web site refers to its solicitors as "Emissaries."[16] US Mission has not proved falsity. Nor can it prove the falsity of the statement about residents reporting no mention of religion because the statements are simply reports of what others told the reporters and there is no evidence of misreporting.

---

[16] http://www.usmission.org.

*7. A statement that reports from neighborhood residents that solicitors from US Mission did not mention religion "raise[ ] the question if this organization might be shrouding their panhandling in religious free speech. That prevents them from being regulated like other businesses going door to door"*

¶22 This is a statement of opinion. A statement of opinion is not actionable as defamatory.[17]

*8. A statement that solicitors are "right out of jail"*

¶23 The actual statement is that the investigators "discovered the kinds of guys coming to your door are basically the kind right out of jail." Putting the phrase "right out of jail" in the context of the rest of the sentence and the substance of the stories, there is no defamation. "[B]asically the kind right out of jail" can be taken as either an opinion or a generalization of the kind of persons who use US Mission as transitional housing. As an opinion, the statement cannot be defamatory. As a fact, the statement is not false because it is undisputed that some of the residents come there upon being released from jail.

*9. "Bevy," "plenty," "recruits," "used"*

¶24 US Mission alleges that statements in KIRO's stories that contain these words are, because of these words, false and defamatory. In defamation actions, we must give words their natural and obvious meaning.[18] Accordingly, if the words, in their natural and obvious meaning, do not render the statements in which they appear false, then there is no defamation.

¶25 Moreover, where, as here, the stories contain true statements, the fact that the statements in which these words appear may be false does not end the inquiry.

---

[17] *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 591, 943 P.2d 350 (1997).

[18] *Yeakey*, 156 Wn. App. at 792.

With respect to falsity, Washington does not require a defamation defendant to "prove the literal truth of every claimed defamatory statement." "A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting,' is true." "The 'sting' of a report is defined as the gist or substance of a report when considered as a whole." In applying this test, [the court] require[s] plaintiffs to show that the false statements caused harm distinct from the harm caused by the true portions of a communication.[19]

"Where a report contains a mixture of true and false statements, a false statement (or statements) affects the 'sting' of a report only when 'significantly greater opprobrium' results from the report containing the falsehood than would result from the report without the falsehood."[20]

a. *US Mission sends "a bevy of historically violent felons, burglars and robbers to your house to collect money -- and there isn't a thing you can do about it"*

¶26 US Mission argues that use of the term "bevy" connotes that it deliberately sent a large number of violent felons into neighborhoods to solicit money. We agree that the natural and obvious meaning of the term "bevy" suggests a large number. There is, however, no evidence in the record as to the precise number of US Mission residents with prior felony convictions who solicited donations under the mission's pay-to-stay policy. Brian Jones, US Mission's secretary-general, estimated that at most five percent of its residents have felony convictions. His statement is in the present tense, conveying the number of residents with felony convictions in the facility at the time of his declaration. There is no evidence as to the total number of residents with felony convictions who have ever lived in US Mission's transitional housing and who were, under its pay-to-stay policy, sent into neighborhoods to solicit door-

[19] *Mohr*, 153 Wn.2d at 825 (citations omitted) (quoting *Mark*, 96 Wn.2d at 494; *Herron*, 112 Wn.2d at 769).

[20] *Herron*, 112 Wn.2d at 769 (quoting *Mark*, 96 Wn.2d at 496).

to-door. However, even assuming that US Mission did not send a "bevy" of felons into neighborhoods, US Mission has not shown that the statement caused harm distinct from the harm caused by the true statements regarding US Mission's practice of requiring all of their residents, those with prior convictions and those without prior convictions, to engage in door-to-door solicitations. Accordingly, even if false, the statement did not affect the sting of KIRO's stories.

> b. *"Using public records, KIRO Team 7 Investigators did a routine address match and found plenty of felons who have lived at the Mission house in north Seattle. On top of two sex offenders, we found guys with burglary, robbery, attempted arson, drug manufacturing, assault, and domestic violence convictions"*

¶27 US Mission takes issue with the phrase "plenty of felons." In its natural meaning, "plenty" connotes a large or ample amount. Even if the statement is false because "plenty of felons" did not reside at US Mission's house, the records on which the reporter relied show that persons convicted of the listed crimes did in fact reside at the house. Again, we cannot conclude that this statement altered the sting of KIRO's stories. We agree with the trial court that "[e]ven if it was a hundred people with eight felons, . . . that would [not] have had a materially adverse impact on the viewer."[21]

> c. *"Last month we revealed how the self-proclaimed church recruits felons, some with violent criminal histories, to live in their transitional housing program, and then go panhandling as a group into your neighborhoods"*

¶28 US Mission claims that it does not "recruit" felons. We agree with US Mission that the term "recruit" suggests

---

[21] *See Mark*, 96 Wn.2d at 496 (holding that an inaccuracy in the report of the precise amount of fraudulent Medicaid billings the defendant was convicted of did not alter the sting of the story, which was the defendant's arrest for Medicaid fraud involving a large amount of money; in other words it was the theft, not the amount of the theft, that constituted the sting).

a deliberate seeking out of individuals. There is no evidence in the record that US Mission actively sought felons to become residents in its housing facilities. Again, however, this statement does not alter the sting of KIRO's stories, which is that some of US Mission's residents are or were felons and that all residents of US Mission's housing facilities are required to, and do, solicit donations door-to-door in residential neighborhoods.

 d. *The headline "Jailhouse Used to Find Door-To-Door Solicitors"*

¶29 When viewed out of the context of the entire story, the headline suggests that US Mission intentionally sought inmates to become residents and engage in door-to-door solicitation. But, when viewed in the context of the entire story, the headline does not alter the sting of the story. Nor does the headline add to the harm of the true parts of the story, which are that persons with felony and nonfelony convictions reside and resided at US Mission's house and that all residents are required to engage in door-to-door solicitation in order to reside at the facilities.

## C. *Privilege and Damages*

¶30 In response to arguments KIRO makes in its respondent's brief, US Mission argues for the first time in its reply brief that the statements in the two stories are not privileged and that it adequately alleged damages. The trial court did not rule on the issues of privilege and damages. We generally do not address issues raised for the first time in a reply brief and decline to do so here.[22]

## D. *Reporter's History*

¶31 US Mission includes in its statement of facts a discussion of reporter Chris Halsne's "history of reckless

---

[22] *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

false reporting." These assertions, even if true, have no bearing on the merits of US Mission's defamation claim.

III. *Anti-SLAPP Statute*

¶32 In addition to a dismissal under CR 12(c), KIRO sought dismissal of US Mission's complaint under RCW 4.24.525, the anti-SLAPP statute. That statute allows a party to bring a special motion to strike a claim that is based on an action involving public participation and petition.[23] An "action involving public participation and petition" includes:

(a) Any oral statement made, or written statement or other document submitted, in a legislative, executive, or judicial proceeding or other governmental proceeding authorized by law;

(b) Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive, or judicial proceeding or other governmental proceeding authorized by law;

(c) Any oral statement made, or written statement or other document submitted, that is reasonably likely to encourage or to enlist public participation in an effort to effect consideration or review of an issue in a legislative, executive, or judicial proceeding or other governmental proceeding authorized by law;

(d) Any oral statement made, or written statement or other document submitted, in a place open to the public or a public forum in connection with an issue of public concern; or

(e) Any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public concern, or in furtherance of the exercise of the constitutional right of petition.[24]

¶33 A party bringing a special motion to strike has the initial burden of showing by a preponderance of the evi-

___

[23] RCW 4.24.525(4)(a).

[24] RCW 4.24.525(2).

dence that the claim is based on an action involving public participation and petition. If the moving party meets this burden, then the responding party must establish by clear and convincing evidence a probability of prevailing on the claim. If the responding party meets this burden, the court must deny the motion to strike.[25]

¶34 The trial court granted KIRO's motion to strike under CR 12(c) and specifically did not rule on whether dismissal under RCW 4.24.525 was or was not warranted. Nevertheless US Mission presents arguments on appeal as to why its complaint should not be dismissed under the statute. It raised these arguments below in its response to KIRO's motion to strike. First, it argues that the statute does not apply to KIRO's stories because US Mission's defamation claim is not based on an action involving public participation and petition. Second, it argues that it meets its burden of showing by clear and convincing evidence that it is likely to prevail. Third, it argues that RCW 4.24.525 is unconstitutional because it requires a showing of a probability of prevailing before the plaintiff has had the opportunity to conduct discovery, thereby violating the doctrine of separation of powers and the right of access to courts. Fourth, it argues that RCW 4.24.525 is unconstitutional because it violates the First Amendment to the United States Constitution. Finally, it argues that RCW 4.24.525(6) conflicts with CR 11.[26]

---

[25] RCW 4.24.525(4)(b).

[26] RCW 4.24.525(6) provides:

(a) The court shall award to a moving party who prevails, in part or in whole, on a special motion to strike made under subsection (4) of this section, without regard to any limits under state law:

(i) Costs of litigation and any reasonable attorneys' fees incurred in connection with each motion on which the moving party prevailed;

(ii) An amount of ten thousand dollars, not including the costs of litigation and attorney fees; and

(iii) Such additional relief, including sanctions upon the responding party and its attorneys or law firms, as the court determines to be necessary to deter repetition of the conduct and comparable conduct by others similarly situated.

(b) If the court finds that the special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award to a responding

¶35 KIRO filed a cross appeal, alleging that the trial court erred by failing to award it its attorney fees and impose a $10,000 penalty pursuant to RCW 4.24.525(6).

¶36 The Reporters Committee for Freedom of the Press, the Washington Newspaper Publishers Association, and Allied Daily Newspapers of Washington filed a joint motion to file an amici curiae brief.[27] We grant the motion. The amici argue in favor of the constitutionality of the anti-SLAPP statute and of affirming the dismissal of US Mission's claims against KIRO.

¶37 The trial court has not ruled on any of the issues involving the anti-SLAPP statute. Indeed, the trial court specifically stated it was not doing so. We avoid deciding constitutional issues where a case may be fairly resolved on other grounds.[28] Moreover, at oral argument before this court, counsel for KIRO agreed that if we affirm the trial court's dismissal of US Mission's defamation claim under CR 12(c), then we need not reach the claim under the anti-SLAPP statute raised in its cross appeal. We decline to address the issues involving the anti-SLAPP statute.

¶38 Affirmed.

LEACH, C.J., and ELLINGTON, J. PRO TEM., concur.

Review denied at 177 Wn.2d 1014 (2013).

---

party who prevails, in part or in whole, without regard to any limits under state law:

(i) Costs of litigation and any reasonable attorneys' fees incurred in connection with each motion on which the responding party prevailed;

(ii) An amount of ten thousand dollars, not including the costs of litigation and attorneys' fees; and

(iii) Such additional relief, including sanctions upon the moving party and its attorneys or law firms, as the court determines to be necessary to deter repetition of the conduct and comparable conduct by others similarly situated.

[27] The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors. The Washington Newspaper Publishers Association is a nonprofit trade group representing about 130 community newspapers in the state. Allied Daily Newspapers of Washington is a nonprofit association representing 25 daily newspapers in the state.

[28] See Probst v. Dep't of Ret. Sys., 167 Wn. App. 180, 183 n.1, 271 P.3d 966 (2012) ("appellate courts avoid deciding constitutional issues where case may be fairly resolved on other grounds" (citing Cmty. Telecable of Seattle, Inc. v. City of Seattle, Dep't of Exec. Admin., 164 Wn.2d 35, 41, 186 P.3d 1032 (2008))).