[No. 14418-6-III. Division Three. March 26, 1996.]

JOHN D. CLARDY, *Appellant*, v. THE COWLES PUBLISHING COMPANY, ET AL., *Respondents*.

---

[7]YVD has moved to strike Superior's second revised appendix to its reply brief. The motion is denied.

54

*John D. Clardy*, pro se.

*Duane M. Swinton* and *Witherspoon, Kelley, Davenport & Toole, P.S.*, for respondents.

SWEENEY, C.J. — ██ ██ A public figure must prove actual malice to recover for defamation. *New York Times*

*Co. v. Sullivan,* 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). A public figure is one who has attained special "prominence in the affairs of society." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). A person may be a public figure for all purposes or for a limited purpose. *Gertz,* 418 U.S. at 351.

John D. Clardy spearheaded the Mission Springs development, the biggest planned unit development ever proposed for Spokane County. It had an ultimate mortgage value of $45 million. On behalf of Mission Springs Limited Partnership, Mr. Clardy applied for mortgage insurance through the United States Department of Housing and Urban Development (HUD). The development ran into vocal public opposition after it had been approved, but before HUD had committed to insure financing. Mr. Clardy stepped into the hailstorm by attending a meeting with the opposition leader, speaking out in favor of the project, and contacting public officials, all in an attempt to keep the HUD commitment on track. We are asked to decide whether Mr. Clardy became a limited-purpose public figure by his involvement in the Mission Springs project. We conclude that he did and affirm the superior court's summary dismissal of his defamation claim.

FACTS

Two newspaper articles by *The Spokesman Review* reporter Bill Morlin prompted Mr. Clardy's defamation suit. The first, published on July 29, 1993, opened with the headline, "Tax felon to get HUD insurance — Huge project under protest." Mr. Morlin reported that Mr. Clardy had been convicted of federal income tax evasion in 1980. He also reported that on behalf of landlords, Mr. Clardy had attempted to evict 400 families from their rental homes in California in 1972. Reporting on the Mission Springs project, Mr. Morlin told readers that Mr. Clardy had applied for $45 million in federal housing insurance,

that neighbors had opposed the project, and that Mr. Clardy had asked the director of the Department of Ecology (DOE) to fire one employee and discipline two others because they opposed the project.

A second article, published on December 14, 1993, was headlined "Developer's address fictitious — Mission Springs mortgagee lists bad address with HUD." In it Mr. Morlin reports that paperwork submitted to HUD on the Mission Springs project listed a fictitious address and the same fictitious address was used on Mission Springs "corporation papers." Mr. Morlin reported that corporate papers listed Mr. Clardy as secretary and partner in the Mission Springs project. Finally, he reported that HUD was not concerned about the nonexistent address.

Mr. Clardy sued Cowles Publishing Company, publisher of *The Spokeman-Review*, and Mr. Morlin (hereinafter Cowles) for defamation in January 1994. Following a motion by Cowles, the court summarily dismissed Mr. Clardy's complaint. It concluded that Mr. Clardy was a limited-purpose public figure and therefore had to prove malice by clear and convincing evidence. And, he had failed to do so. Mr. Clardy appeals.

### Discussion

### A. Defamation

■ Proof of defamation requires a showing of (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *LaMon v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027, *cert. denied*, 493 U.S. 814 (1989); *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981), *cert. denied*, 457 U.S. 1124 (1982). When the plaintiff is a public figure or public official, the degree of fault required is actual malice. *LaMon*, 112 Wn.2d at 197.

■ The question here is whether Mr. Clardy's role in and activities on behalf of Mission Springs made him a limited-purpose public figure. Cowles claims that it did. He claims it did not. That question is an issue of law;

review is therefore de novo. *See Rosenblatt v. Baer*, 383 U.S. 75, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966).

## B. Limited-Purpose Public Figure

■ ■ In *New York Times*, a plurality of the United States Supreme Court concluded that many traditional common law actions for defamation could interfere with First Amendment rights of free expression. To avoid such interference, it held that a public official could recover damages for defamation only if the official proved that a defamatory statement was made with "actual malice"; that is, with knowledge that the statement was false or with reckless disregard of its truth. *New York Times*, 376 U.S. at 279-80. Actual malice had to be proved with "convincing clarity." *New York Times*, 376 U.S. at 285-86.

Both the standard of fault—actual malice, and the standard of proof—convincing clarity, established in *New York Times* were later extended to public figures who were not public officials. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 154-55, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967). *Curtis*, however, gave little guidance on the question of when a private citizen becomes a "public figure."

In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971), a plurality of the Court held that the actual malice standard should focus on "all discussion and communication involving matters of public or general concern," *Rosenbloom*, 403 U.S. at 44, rather than on the status of the person defamed:

> If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved.

*Rosenbloom*, 403 U.S. at 43.[1]

■ The *Rosenbloom* court's approach was rejected in

---

[1] In *Miller v. Argus Publishing Co.*, 79 Wn.2d 816, 490 P.2d 101 (1971), *overruled by Taskett v. KING Broadcasting Co.*, 86 Wn.2d 439, 546 P.2d 81 (1976), the Washington Supreme Court relied on *Rosenbloom*, noting that although the

*Gertz.* In its place, *Gertz* set up two categories of public figures: limited-purpose public figures and general-purpose public figures. Limited-purpose public figures are those who voluntarily inject themselves or are drawn into a public controversy and thereby become public figures for a limited range of issues. *Gertz*, 418 U.S. at 351. The threshold question posed in *Gertz* is whether the defamatory statement involves a matter of public concern. The next focuses on the nature and extent of the plaintiff's participation in that public controversy. *Gertz*, 418 U.S. at 352 ("did he engage the public's attention in an attempt to influence its outcome" and did he "thrust himself into the vortex of this public issue"). While an individual could become a public figure through no purposeful action of his own, *Gertz* concluded that instances of truly involuntary public figures "must be exceedingly rare." *Gertz*, 418 U.S. at 345.

*Gertz* gave greater protection to speech about public figures, than speech about private citizens, because public figures usually have greater media access and hence "a more realistic opportunity to counteract false statements [than] private individuals normally enjoy." *Gertz*, 418 U.S. at 344. Private citizens were also "more deserving of recovery" because they had not assumed the risk of close public scrutiny—a necessary consequence of involvement in public affairs. *Gertz*, 418 U.S. at 344. *See also Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 99 S. Ct. 2701, 61 L. Ed. 2d 450 (1979). Legal scholars have criticized the *Gertz* rationale because it focuses on protecting the individual rather than the First Amendment goal of protecting free speech.[2]

After *Gertz*, several federal circuits developed tests to

decision was signed by only three Justices, Justice White in his concurring opinion observed that two additional Justices would go even further to protect the news media. *Miller*, 79 Wn.2d at 825.

[2]Robert C. Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and "Hustler Magazine v. Falwell,"* 103 HARV. L. REV. 601, 669 n.333 (1990) ("[T]he Court's justification for providing greater constitutional protection to speech about 'public figures' than to speech about private figures involving matters of public concern turns almost entirely on

determine whether a person was a limited-purpose public figure. In the Fourth Circuit, the test included consideration of whether:

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation.

*Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994).

The D.C. Circuit's test requires a three-step analysis: (1) the controversy at issue must be public in the sense that people are debating it and it has foreseeable and substantial ramifications for nonparticipants; (2) the plaintiff must have more than a trivial or tangential role in the controversy and must have thrust himself to the forefront of the controversy so as to become a factor in its ultimate resolution; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296-98 (D.C. Cir.), *cert. denied*, 449 U.S. 898 (1980); *Tavoulareas v. Piro*, 817 F.2d 762, 771-75 (D.C. Cir.), *cert. denied*, 484 U.S. 870 (1987). This three-part test was adopted by the Fifth Circuit in *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433-34 (5th Cir. 1987).

Since *Gertz*, only two Washington cases have addressed the limited-purpose, public-figure question. *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 723 P.2d 1195 (1986), *review denied*, 107 Wn.2d 1020, *cert. denied*, 482 U.S. 916

considerations of individual equity, considerations that have little to do with defining and protecting speech necessary for democratic self-governance."); David J. Branson & Sharon A. Sprague, *The Public Figure—Private Person Dichotomy: A Flight from First Amendment Reality*, 90 Dick. L. Rev. 627, 634-35 (1986) ("The test applied by *Gertz* and its progeny focuses on assumption of risk rather than true first amendment concerns. The inquiry no longer addresses the public interest, even directly. Rather, the inquiry focuses on whether the plaintiff voluntarily assumed the risk of defamation by entering a public controversy." (footnote omitted)).

(1987); *Exner v. American Medical Ass'n*, 12 Wn. App. 215, 529 P.2d 863 (1974), *review denied*, 85 Wn.2d 1003 (1975). Neither, however, sets forth any definitive test to determine when someone becomes a limited-purpose public figure. Both emphasize the voluntariness of a private person's notoriety. *E.g.*, *Exner*, 12 Wn. App. at 222. ("Private citizens do not become public figures subject to damaging falsehoods concerning their lives without recourse when they are suddenly thrust into the news by events. When chance and the news media bring a private citizen into the public eye, the right to redress for defamation is not diminished so long as their notoriety was not of their own choosing.")

In *Exner*, a doctor sued for defamatory statements published in an article on fluoridation in the American Medical Association's journal. The court concluded that the doctor was a limited-purpose public figure on the fluoridation issue because he assumed leadership and attempted to influence the issue's outcome. He therefore had abandoned his anonymity. *Exner*, 12 Wn. App. at 224.

In *Camer*, the court also focused on whether the plaintiff's involvement in the public issue was voluntary. The defamation lawsuit in *Camer* followed an article in *The Seattle Post-Intelligencer* that announced " 'Nuisance' suits clog the courts." *Camer*, 45 Wn. App. at 31. The article reported the effects and implications of pro se litigants on the court system. Two pro se litigants sued for defamation. They conceded they may have become public figures in those areas in which they were active litigants— environment, zoning, and public education. They were not, however, public figures on the question of court overcrowding. *Camer*, 45 Wn. App. at 42. Division One of this court rejected the argument: "[T]here were ways in which they voluntarily sought to influence the resolution of public issues, *e.g.*, a press release, 'letters to the editor', frequent participation in public meetings and hearings." *Camer*, 45 Wn. App. at 43.

Both *Camer* and *Exner* focus on only one part of the

*Gertz* private-figure/public-figure inquiry—whether the plaintiff voluntarily entered the public controversy. Neither case considers the plaintiff's opportunities for public rebuttal, an important consideration under *Gertz*. Neither requires consideration of whether the alleged defamatory comments were germane to the plaintiff's participation in the controversy or whether the controversy existed prior to publication of the defamatory statement. Finally, neither addresses the question whether the plaintiff sought to influence the resolution or outcome of the controversy and whether in doing so assumed a role of special prominence.

We believe that balancing the right to report on issues of public interest against the right of private citizens to be free from defamatory comments requires consideration of more than simply whether the plaintiff voluntarily injected himself or herself into the fray. We therefore adopt the five-part test outlined by the court in *Foretich* as a set of nonexclusive considerations for determining whether a plaintiff in a defamation case is a limited-purpose public figure. We then apply those nonexclusive considerations to the facts here.

■ 1. <u>Access to Media</u>. Once the press began to report on the Mission Springs project, it appeared eager to report any comments about the project, including those of Mr. Clardy. Numerous letters to the editor were published. When Mr. Clardy complained about the December 14 story of his fictitious address, the paper ran a correction on December 15.

■ 2. <u>Voluntariness and Nature of Role</u>. A person becomes a public figure only if he voluntarily "draw[s] attention to himself" or uses his position in the controversy "as a fulcrum to create public discussion . . . ." *Wolston,* 443 U.S. at 168. He must "thrust himself into the vortex of [the] public issue [and] engage the public's attention in an attempt to influence its outcome." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 352, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

Mr. Clardy admits he had a financial stake in the Mission Springs project. And, at least at some point prior to the published articles at issue, he was an officer in the corporation. He had also personally owned the option on the land. He signed HUD documents on behalf of the limited partnership to obtain insurance for financing the project and met with HUD officials. All of this would have established Mr. Clardy's role in the development, but without more, would not necessarily have thrust Mr. Clardy into the controversy. These are the acts of many private business people involved in real estate development.[3]

Mr. Clardy voluntarily became more involved in the Mission Springs controversy when he contacted two state legislators, the Governor, the director of DOE, and the head of personnel at Eastern Washington University

---

[3]An employee or owner of a private business may become a public figure under certain circumstances. *See, e.g., Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 708-09 (4th Cir.) (scientist employed by firm operated for the National Cancer Institute was limited-purpose public figure because he had significant access to media and important sources of public health and scientific communications, he had testified before Congress and the Environmental Protection Agency, had given lectures, had 35 or more published papers, and his findings were discussed in numerous media reports), *cert. denied*, 501 U.S. 1212 (1991); *Trotter*, 818 F.2d 431 (president of a private business involved with labor violence was limited-purpose public figure because the violence was of public concern, he had primary responsibility for general overall policy of the company, he undertook important efforts to influence resolution of shareholder protests, and the alleged defamation was germane to his role in the controversy); *Okun v. Superior Court*, 29 Cal. 3d 442, 629 P.2d 1369, 175 Cal. Rptr. 157 (real estate developer was public figure with regard to condominium project on land he received in an exchange with the city where he also was involved in adoption of zoning ordinance which allowed construction of condominiums on the exchanged land), *cert. denied*, 454 U.S. 1099 (1981). *But see Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979) (research scientist who received numerous federal grants was not a public figure for limited-purpose of comment on his receipt of federal funds because he did not voluntarily enter the controversy over federal government accountability by accepting government funds and he was completely unknown to the public before Senator Proxmire presented him with the "Golden Fleece" award); *Lake Havasu Estates, Inc. v. Reader's Digest Ass'n*, 441 F. Supp. 489 (S.D.N.Y. 1977) (land sales company did not invite comment nor thrust itself into forefront of land fraud controversy and therefore was not a public figure); *Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 33 A.L.R.4th 193 (Colo. 1982) (corporation whose activities were not affected with public interest and which merely availed itself of marketplace was not a public figure even though press was attracted to its activities).

(EWU). He contacted the latter two agencies to complain about two EWU professors and three DOE employees who had criticized the project. But even here, Mr. Clardy was not trying to influence public opinion so much as move government employees to action.

Mr. Clardy "thrust himself into the vortex of [the] public issue" when he sent letters to residents in the Mission Springs area telling the "new neighbors" about the Mission Springs project and advising them he would be updating them on its progress. These actions were clearly an attempt to influence public sentiment and resolution of the controversy created primarily by the residents to whom the letters were sent. These actions satisfy the *Gertz* requirement that a person voluntarily draw attention to himself or thrust himself to the front of the public controversy.

3. Statements Germane to Controversy. The thrust of the July 1993 article was that Mr. Clardy had been convicted of tax evasion and was involved in a project to develop an apartment and townhouse complex with loans guaranteed by HUD. Mr. Morlin also reported that Mr. Clardy had attempted to evict 400 families from rental homes in California in 1972. The article also quoted Mr. Clardy as denying an ownership interest in the corporation developing the site—Feature Realty. The December 1993 article focuses on what Mr. Morlin had concluded was a false address. These articles focused on basic questions surrounding the project: who, what, and how. By the time these articles were published, controversy surrounded the project.

These articles, while not directly related to events which thrust this project into the limelight—the neighbors' protest—nonetheless answer questions about those involved in the development, their prior experience with government-guaranteed financing and management of residential housing generally. They are therefore germane.

4. Prior Existence of Controversy. Public opposition to the City of Spokane's approval of the largest proposed

planned unit development in Spokane county existed before publication of Mr. Morlin's articles. Cowles introduced numerous newspaper articles published prior to the two at issue here which reported the creation of a neighborhood association to oppose the project.

5. Plaintiff Retain Public-Figure Status at the Time of the Alleged Defamation. These articles were printed during the height of the controversy surrounding this project—July and December. Mr. Clardy, as one of the project's principals, retained his public-figure status throughout this period.

Mr. Clardy was a limited-purpose public figure with respect to the Mission Springs project.

## C. Prima Facie Case of Defamation

We turn now to the question of whether Mr. Clardy, as a limited-purpose public figure, established a prima facie case of defamation.

Mr. Clardy argues that statements made about him were false, were made with actual malice, and damaged him. He contends that the July article's false statement that *he* applied for HUD insurance, when combined with the true statement that he was a tax felon, affected the "sting" of the story. *Herron v. KING Broadcasting Co.*, 112 Wn.2d 762, 769, 776 P.2d 98 (1989). As to the December article, Mr. Clardy contends the statements regarding the fictitious address were false, a fact Cowles admits, and therefore all remaining elements of defamation were established.

 The "sting" of a report is "the gist or substance of a report when considered as a whole." *Herron*, 112 Wn.2d at 769. Mr. Clardy must show the false statement or statements affect the sting of the report. *Mark v. Seattle Times*, 96 Wn.2d 473, 494-97, 635 P.2d 1081 (1981), *cert. denied*, 457 U.S. 1124 (1982). Cowles must show that the statement is substantially true or that the gist of the story, the portion that carries the "sting," is true. *Mark*, 96 Wn.2d at 494.

We turn first to whether the gist of the articles—their sting—was true.

1. July Article. The July 29 article headlined that a tax felon, Mr. Clardy, was about to get HUD insurance. Mr. Morlin reported that a 59-year-old developer (Clardy) wanted HUD "to guarantee financing for the $45 million Mission Springs project . . . ." He went on to report that (a) the Mission Springs project was being developed by Mission Springs, Inc., and its president in Sacramento could not be reached for comment; (b) Mr. Clardy said the site was owned by Feature Realty, a California corporation controlled by Russell and Susan Lugli of Sacramento; (c) Mr. Clardy said he had no ownership in Feature Realty or the Mission Springs corporation, although he would "be paid a percentage of the profits out of the project"; and (d) Mr. Clardy was listed as vice-president and treasurer of the Mission Springs corporation, according to the Washington State Secretary of State's office.

Mr. Clardy claims the article is false because he did not apply for HUD insurance. And he had no ownership interest in Feature Realty (which held title to the land) or in Mission Springs, Inc., at the time the article was published. Further, the amount of insurance applied for was $10.2 million, not $45 million. Mr. Clardy argues this false information, combined with a statement that he was a tax felon (a fact he admits), affected the "sting" of the July article. It resulted in " 'significantly greater opprobrium' " than would have resulted "from the report without the falsehood." *Herron*, 112 Wn.2d at 769 (quoting *Mark*, 96 Wn.2d at 496).

■■ There are several flaws in Mr. Clardy's argument. First, the article did not state that Mr. Clardy applied for $45 million in insurance. It stated that insurance was being sought for the $45 million project. While the statement might be ambiguous, even misleading, it is not false. Mr. Clardy stated in deposition that the project was being developed in four stages. It follows that insurance for the project would also be supplied in four stages. The

headline and introductory statement that Mr. Clardy was getting HUD insurance were, however, inaccurate. Cowles does not contend otherwise. What Cowles argues is that all statements in a news article need not be "literally true" so long as the gist of the article is true. We agree.

The gist of the July article was true. Although Mr. Clardy may not have had an ownership interest in the project at the time the article was published, he was the "key figure." He would also benefit from the development and from federal housing insurance.

Mr. Clardy resigned as secretary-treasurer of Mission Springs, Inc., in April 1993 and held no office in the company at the time the article was published. He, however, still coordinated the Mission Springs project and was "heading up the team." He was vice-president of Feature Realty in July 1993 and had a substantial interest in the Mission Springs project. He signed the HUD application on behalf of Mission Springs, Inc. There is no evidence to support or refute Mr. Clardy's contention that he did not hold an ownership interest in the Mission Springs project at the time the July article was published. He did, however, retain a financial interest which he called "significant." When writing to DOE and others, Mr. Clardy referred to himself as the developer of the Mission Springs project and an owner of Mission Springs. The May 1993 letters to Mission Springs neighbors were signed as "Your New Neighbor, John D. Clardy, Mission Springs." Mr. Clardy was registered agent for both Mission Springs, Inc., and Mission Springs Limited Partnership. None of this was contradicted by any admissible evidence Mr. Clardy presented to the court.

While the exact nature of his proprietary interest may have changed, the gist of this article was that Mr. Clardy was a key figure in the project and stood to collect a percentage of the income. That is true.

Mr. Clardy admitted he was "heading up" the developmental team. He met with numerous city departments. He met with HUD and DOE officials and state legislators.

He had a significant financial stake in the project. Mr. Clardy tried to have DOE and EWU employees fired because of their opposition to the project. He attended a meeting at city hall to "accommodate the public relations side of things" when opposition to the project first surfaced; and he sent letters to Mission Springs' neighbors when opposition became more intense. In sum, Mr. Clardy failed to establish the falsity of statements in the July article.

Moreover, Mr. Clardy failed to establish damages. He was not forced to give up his financial interest in Mission Springs as a result of the article, nor was the project derailed. It was ultimately approved, along with HUD's commitment to insure the financing.

2. December Article. The December article headlined "Developer's address fictitious" and "Mission Springs mortgagee lists bad address with HUD." Mr. Morlin went on to report that HUD's firm commitment for the $10.6 million first phase of the project shows a fictitious address in Deer Park, but that HUD was not seriously concerned. He reported that "[t]he same fictitious address was used on Mission Springs corporation papers listing John D. Clardy, of Deer Park, as a secretary and partner in the project." It further stated that Mr. Clardy, convicted of two tax felonies, was prohibited by HUD regional officials from further involvement in the Mission Springs project. It also stated that Mr. Clardy represented "California developer [Russell] Lugli" who "has until Dec. 25 to finalize the HUD-guaranteed loan . . . ."

Cowles contends "[t]here is absolutely no representation anywhere in the December 14, 1993, story that Clardy personally had a fictitious address." It contends "[t]he mere fact that Clardy may at one time have been involved with Mission Springs Limited Partnership does not make this statement of and concerning him . . . ." It cites *Patzer v. Liberty Communications, Inc.*, 58 Or. App. 679, 650 P.2d 141 (1982), which held that merely because a news article pertains to a corporation of which plaintiff is a member or

officer does not make the statement of and concerning the plaintiff. The argument is not persuasive. It flies in the face of Cowles' earlier argument that the statements about Mr. Clardy in the July article were substantially correct because Mr. Clardy had a financial interest in the "project."

The statement regarding the fictitious address was false. The address existed. Cowles published a retraction on December 15. The next question is whether Mr. Clardy established that the false statement was published with actual malice and whether he was damaged by it.

Mr. Clardy contends that publication was done with reckless disregard for the truth. He notes that all Mr. Morlin had to do to determine whether the address was fictitious was call the Stevens County Planning Department, just as the Deer Park postmaster had told him to do.

There is no showing of malice by Mr. Morlin. He checked with the Deer Park postmaster and a postal worker. He was told Mr. Clardy received his mail through a post office box. He asked about the 4951 Sherman Road address. He was told the post office had no record of such an address and did not know of such an address. Mr. Morlin then spoke with a retired Washington state patrolman who checked with a state patrolman in the Deer Park area. The retired patrolman told Mr. Morlin there did not appear to be such an address. Mr. Morlin also went to the area himself to see if such an address existed. He did not find it even though he thought he had gone to the end of Sherman Road. Mr. Morlin also looked at a Metzger map. Mr. Morlin's report may have been inaccurate, but given this level of investigation, it was not malicious.

And again, there is no evidence of damage. Mr. Clardy makes no showing that the article resulted in the project not being insured. Although financing was not concluded within HUD's 60-day firm commitment, that occurred because Russell Lugli was involved in a serious vehicle accident and was unable to execute the necessary docu-

ments. Although Mr. Clardy had an unlimited power of attorney to sign documents, he chose not to do so because of the uncertainty about Mr. Lugli's recovery and his financial situation in the event Mr. Lugli did not fully recover.

The trial court's summary dismissal of Mr. Clardy's defamation action is affirmed.

SCHULTHEIS and MUNSON, JJ., concur.