IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DANIELLE LABOUNTY, a single individual, | No. 84610-8-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| MOUNT BAKER SCHOOL DISTRICT NO. 507, a municipal corporation, | |
| Respondent. | |

CHUNG, J. — Danielle LaBounty sued the Mount Baker School District (District) for discrimination, retaliation, wrongful discharge, and other claims arising from her employment at Mount Baker High School. The District failed to appear, and LaBounty obtained a default judgment against it. The District then filed a CR 60(b)(1) motion to vacate the default judgment. LaBounty appeals the court's order granting the District's motion to vacate. Finding no error, we affirm.

FACTS

LaBounty was employed as a paraeducator and softball coach at Mount Baker High School beginning in 2014 until January 2020. In December 2021, she filed a Washington State tort claim form alleging claims against the District. The form was stamped "received" by the District on December 20, 2021.

In March 2022, LaBounty filed a lawsuit against the District on the same grounds stated in her tort claim form. She alleged disability discrimination in

violation of the Washington Law Against Discrimination (WLAD),[1] retaliation in violation of the WLAD, wrongful discharge in violation of public policy, negligent supervision, defamation, and intentional infliction of emotional distress.

LaBounty's complaint alleges, in summary, as follows. In 2019, during the second half of the 2018-19 school year, she was bullied by fellow paraeducator Cheryl Kirkley and assaulted by a student. Despite her reporting these events to her supervisor, Roger Goodwin, and a teacher, Emily Shpak, no safety plan was created for her. Her 2018-19 performance evaluation conducted by Mount Baker High School principal Matt Durand included what LaBounty called "retaliatory low ratings," and she refused to sign it.[2]

LaBounty's complaint further alleges that she suffered a nonwork-related ankle injury in August that kept her out of work in August and September 2019, for which she sent the District a doctor's note. In October, in response to a request for a status update on her ankle, LaBounty said she could return to work but did not have a release from her doctor. After several communications from the District seeking a doctor's note and discussing scheduling meetings with District Superintendent Mary Sewright and the union, LaBounty e-mailed a letter from a different doctor who was treating her for ADHD, anxiety, and depression,

---

[1] Ch. 49.60 RCW

[2] Durand's evaluation concludes that "Ms. LaBounty is an asset to our campus and I look forward to having her back next year." Across 12 categories, Durand rated LaBounty "Meets Expectations" 33 times, "Area for Growth" zero times, and "Does Not Meet Expectations" four times. Under "Goal Areas for Next Year," there is a note that "Ms. LaBounty is working on her communication with her colleagues and timeliness to her job assignments, there ha[ve] been improvements in this area."

recommending that she take additional time off. LaBounty alleges that the District failed to begin a Family Medical Leave Act (FMLA) or interactive accommodation process. According to LaBounty, the District demanded meetings, sent her letters documenting her absence from work, suspended her, put her on a plan of improvement, retroactively terminated her benefits, and ultimately terminated her.

On March 28, 2022, LaBounty served her summons and complaint on Sewright, who sent it to the District's counsel that same day. In June 2022, LaBounty moved for default because the District had not appeared and answered. A court commissioner granted LaBounty an order of default, and ten days later LaBounty moved for an order of default judgment. Her motion was supported by her declaration, her tort claim form, annual performance reviews, her doctor's note, and other exhibits. The court granted the motion on June 13. The court entered findings of fact and conclusions of law and awarded LaBounty $853,855.74, plus statutory fees and costs.

In July 2022, LaBounty's counsel delivered the court's default judgment, findings of fact, and judgment summary to Sewright.[3] After Sewright received the court's default judgment from LaBounty, the District filed its appearance on July 15, and on July 25, moved to vacate the court's orders of default, default judgment, and its findings of fact and conclusions of law. Its motion included a declaration from its counsel explaining counsel "misunderstood" her legal

---

[3] The parties dispute whether this occurred on Tuesday, July 12, or Thursday, July 14. The document is dated July 12, but it is stamped "received" July 14.

assistant's email that stated "NOA is done" to mean counsel's notice of appearance had been filed, when in fact the legal assistant meant the notice of appearance was ready to be signed by counsel and filed. In her declaration, the District's counsel "accept[ed] full responsibility for the mistake." The District's motion also included a declaration from Superintendent Sewright attaching 23 exhibits supporting its defense against LaBounty's claims.

On September 14, 2022, the court granted the District's motion to vacate the default judgment. It found the District "has presented substantial evidence of, at a minimum, a *prima facie* defense to the claims alleged by Plaintiff Danielle LaBounty."[4] It also found the District's failure to timely appear or answer "was occasioned by a mistake of Defendant's legal counsel." It found the District "acted diligently to address" the default judgment, and it found that any hardship to LaBounty "can be addressed by authorizing the imposition of fees and costs as sanctions" against the District. At the beginning of the next week, on September 19, the District filed an answer to LaBounty's complaint.

LaBounty appeals the court's order granting the District's motion to vacate the default judgment.

DISCUSSION

CR 60(b)(1) allows a court "[o]n motion and upon such terms as are just" to grant a moving party relief from an order due to a party's "[m]istakes,

---

[4] The order states that it is entering "findings of fact and conclusions of law," but does not distinguish or label these categories separately.

4

inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order." A motion to vacate "shall" be "supported by the affidavit of the applicant . . . setting forth a concise statement of the facts . . . upon which the motion is based, and if the moving party be a defendant, the facts constituting a defense to the action or proceeding." CR 60(e)(1).

Default judgments are "not favor[ed]" because we "prefer to give parties their day in court and have controversies determined on their merits." Morin v. Burris, 160 Wn.2d 745, 754, 161 P.3d 956 (2007). "Balanced against that principle is the necessity of having a responsive and responsible system which mandates compliance with judicial summons." Griggs v. Averbeck Realty, Inc., 92 Wn.2d 576, 581, 599 P.2d 1289 (1979). Proceedings to vacate a default judgment are equitable in character, and relief should be "afforded in accordance with equitable principles." Id. "The trial court should exercise its authority 'liberally, as well as equitably, to the end that substantial rights be preserved and justice between the parties be fairly and judiciously done.' " Id. at 582 (quoting White v. Holm, 73 Wn.2d 348, 351, 438 P.2d 584 (1968)).

Courts take into consideration four factors in determining whether to vacate a default judgment:

> (1) That there is substantial evidence extant to support, at least prima facie, a defense to the claim asserted by the opposing party;
> (2) that the moving party's failure to timely appear in the action, and answer the opponent's claim, was occasioned by mistake, inadvertence, surprise or excusable neglect;
> (3) that the moving party acted with due diligence after notice of entry of the default judgment; and
> (4) that no substantial hardship will result to the opposing party.

5

White, 73 Wn.2d at 352. The four White factors are "not equally weighted." Shepard Ambulance, Inc. v. Helsell, Fetterman, Martin, Todd & Hokanson, 95 Wn. App. 231, 238, 974 P.2d 1275 (1999). Where the moving party is able to demonstrate a "strong or virtually conclusive defense" to a claim, "scant time" will be spent inquiring into the reasons for the entry of default. White, 73 Wn.2d at 352. On the other hand, where the moving party is able to properly demonstrate at least a prima facie defense, the reasons for failing to timely appear in the action before the default "will be scrutinized with greater care." Id. at 353.

We review a court's decision regarding a motion to vacate for abuse of discretion. Griggs, 92 Wn.2d at 582. "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). "Our primary concern in reviewing a trial court's decision on a motion to vacate is whether that decision is just and equitable." TMT Bear Creek Shopping Ctr., Inc. v. Petco Animal Supplies, Inc., 140 Wn. App. 191, 200, 165 P.3d 1271 (2007). " 'Justice is not done if hurried defaults are allowed, but neither is it done if continuing delays are permitted.' " Id. (quoting Johnson v. Cash Store, 116 Wn. App. 833, 841, 68 P.3d 1099 (2003)).

   I.   Evidence of a defense

As an initial matter, LaBounty contends "the trial court found that only a minimum prima facie defense was presented" by the District. This is a mischaracterization of the court's order, which states the District "has presented substantial evidence of, *at a minimum* a *prima facie* defense to the claims alleged by . . . LaBounty." Clerk's Papers 371 (emphasis added). The distinction matters because where a party's defenses are " 'strong or virtually conclusive . . . scant time will be spent inquiring into the reasons which occasioned entry of the default.' " Shepard Ambulance, 95 Wn. App. at 239 (quoting White, 73 Wn.2d at 352). But the District does not claim its defenses are so "strong or virtually conclusive" that we should pay only "scant time" or attention to the reason for its failure to appear. We need review only whether the court properly granted the CR 60 motion based on consideration of each of the White factors, including whether the District established the existence of, "at least prima facie, a defense" to LaBounty's claims. White, 73 Wn.2d at 352.

LaBounty also suggests that because the District "provides nearly no response or opposition" to the trial court's findings of fact numbers 1-13, those findings "should be deemed as admitted" on appeal. In her reply brief, LaBounty similarly argues the District did not "counter" her declaration, "challenge[ ]" the court's findings of fact, or "answer" her complaint. But the trial court's findings of fact and conclusions of law support its order of default judgment—the same default judgment that the court subsequently vacated by granting the District's

CR 60 motion. LaBounty's suggestion that these factual findings from a vacated order should be admitted is unavailing.[5]

To the extent LaBounty suggests the District cannot satisfy its burden under CR 60 because she has provided contradicting evidence, this misconstrues the relevant standard.[6] The court "does not act as a trier of fact when considering a CR 60 motion," and it "must take the evidence and reasonable inferences in the light most favorable to the CR 60 movant when deciding whether the movant has presented 'substantial evidence' of a 'prima facie' defense." Pfaff v. State Farm Mut. Auto. Ins. Co., 103 Wn. App. 829, 834, 14 P.3d 837 (2000).[7] A defendant moving to vacate a default judgment against it "satisfies its burden of demonstrating the existence of a prima facie defense if it is able to produce evidence which, *if later believed by the trier of fact*, would constitute a defense to the claims presented." TMT, 140 Wn. App. at 202 (citing Pfaff, 103 Wn. App. at 835-36) (emphasis added).

---

[5] Moreover, in support of its CR 60 motion, the District was not required to file an answer to the complaint with denials of its allegations. Rather, CR 60 required it, as the defendant, to set forth "the facts constituting a defense" to LaBounty's claims. Pfaff v. State Farm Mut. Auto. Ins. Co., 103 Wn. App. 829, 834, 14 P.3d 837 (2000).

[6] The court in Pfaff addressed a similar argument that the trial court erred by not finding that her "facts and inferences were stronger than [the CR 60 movant], and by not concluding from such a finding that [the movant] did not have a 'defense.' " 103 Wn. App. at 835. Pfaff argued that the facts favorable to her, rather those favorable to the defendant, were "material" facts that the court should have considered because the court was the trier of fact who weighs and balances the evidence. The court "reject[ed] this view of the trial court's function on a CR 60 motion." Id.

[7] In contrast, "neither Pfaff nor any subsequent decision holds that the trial court must view the evidence in the light most favorable to the defendant when determining whether the defendant is able to demonstrate the existence of a strong or virtually conclusive defense to the plaintiff's claims." TMT, 140 Wn. App. at 203. In the present case, the trial court did not make a specific determination that the District's evidence was "strong or virtually conclusive."

Likewise, LaBounty's hearsay challenges to certain evidence provided by the District are unavailing. CR 60(e)(1) requires only that a motion be "supported by the affidavit of the applicant or the applicant's attorney setting forth a concise statement of the facts or errors upon which the motion is based, and if the moving party be a defendant, the facts constituting a defense to the action or proceeding." Thus, a CR 60(b) movant may rely on an affidavit "to proffer evidence which, *if proved*, would entitle that defendant to relief," as "the purpose of requiring the defendant to demonstrate the existence of a prima facie defense is simply to avoid a useless subsequent trial." TMT, 140 Wn. App. at 204 (citing Griggs, 92 Wn.2d at 583). The defendant must set out concrete facts and cannot merely state allegations. Ha v. Signal Elec., Inc., 182 Wn. App. 436, 449, 332 P.3d 991 (2014). Here, the District supported its motion with the affidavits of its attorney and Superintendent Sewright, along with attachments, and the trial court could consider these documents in determining whether to exercise its discretion to grant the CR 60(b) motion.

With these standards in mind, we review the trial court's order and the District's affidavits supporting its defense to each of LaBounty's claims in turn.

A. Failure to accommodate

LaBounty's complaint alleges the District refused to participate in an interactive accommodation process. The WLAD, RCW 49.60.180(3), requires an employer to " 'take steps reasonably necessary to accommodate an employee's disability.' " Gamble v. City of Seattle, 6 Wn. App. 2d 883, 888, 431 P.3d 1091

(2018) (quoting Johnson v. Chevron U.S.A., Inc., 159 Wn. App. 18, 27, 244 P.3d 438 (2010)).

"The WLAD envisions an exchange between the employer and the employee to ensure that the employee's needs are properly addressed." Gamble, 6 Wn. App. 2d at 892 (citing Goodman v. Boeing Co., 127 Wn.2d 401, 408, 899 P.2d 1265 (1995) ("Reasonable accommodation thus envisions an exchange between employer and employee where each seeks and shares information")). "The employee therefore has a duty to communicate to the employer whether the accommodation was effective." Gamble, 6 Wn. App. 2d at 891 (quoting Frisino v. Seattle Sch. Dist. No. 1, 160 Wn. App. 765, 783, 249 P.3d 1044 (2011)).

The District argues in defense to her accommodation claim that LaBounty "refused to be candid" about her condition, "refused to engage in the interactive process," never had her doctor complete a medical questionnaire it requested, and denied it the opportunity to talk with her doctor. In support, the District presented evidence that LaBounty was not at work when the 2019-20 school year started on August 29. The next week, LaBounty told the District that she broke her ankle over the weekend and would be out at least two weeks. While LaBounty's accident on August 31 did not explain why she missed work on August 29, after LaBounty informed the District of her injury, Sewright emailed LaBounty to ask her for a doctor's note for the absence and a doctor's release for her to come back to work.

The District presented evidence that on September 20, 2019, Sewright sent LaBounty a letter asking to "establish clear understanding," "with documentation from your physician," about her "ability to return to work without limitations or your need for further time off to recover." After a meeting on September 30, Sewright sent LaBounty a letter on October 7 suspending her for two days because at the meeting LaBounty "admitted that [she] *chose* not to show up for work."

On the same day, October 7, Sewright sent LaBounty another letter placing her on a "Plan of Improvement" regarding "Attendance and Punctuality," "Time Management," and "Human Relations and Work Attitude." Sewright's email that attached these letters communicated to LaBounty that she was to "start work on Monday, October 14."

On Sunday, October 13, LaBounty told the District that she was "free to take my boot off now and return to work," but that she "forgot to get my release for work," so she would need "to put in for a sub in the morning." On Wednesday, October 16, LaBounty told the District she was "not released for full duty from my doctor." The District asked LaBounty for "a current doctor's note stating your status as your last letter is now expired." Sewright invited LaBounty to a meeting that day, October 16, but LaBounty answered that "[s]ince I'm not released for full duty from my doctor, the meeting will have to be rescheduled."

On October 21, Sewright sent LaBounty a letter noting LaBounty had "failed to abide by the directives in my October 7 letter," directing her to "attend a

11

meeting with me this week to explain your actions and to discuss the Plan of Improvement," and to "provide the appropriate documentation from your doctor as soon as possible." Sewright warned LaBounty that "[i]f you fail to abide by these directives, you will be subject to further discipline, up to and including discharge from employment."

On November 12, Sewright sent LaBounty an email asking if she was requesting more unpaid leave or if she was "requesting a reasonable accommodation for a disability under the ADA." If the latter, Sewright attached a questionnaire to be completed by LaBounty's doctor in order to "begin the interactive process." LaBounty did not reply. On November 21, Sewright sent LaBounty a letter explaining that she "will be recommending the termination of your employment" because "[y]ou have missed all of the 2019-2020 school year to date." On November 26, Sewright asked LaBounty's counsel whether "Ms. LaBounty is seeking a reasonable accommodation."

Thus, the District presented evidence that it attempted to determine whether LaBounty was seeking an accommodation, but she did not request any specific accommodation other than time off, nor did she communicate with the District about her medical status to advance the interactive process. We conclude that the court did not abuse its discretion when it found that the District satisfied its burden to establish the existence of a prima facie defense to LaBounty's claim of failure to accommodate.

B. Retaliation

LaBounty's complaint alleges the District retaliated against her for engaging in protected activity. "To establish a prima facie case of retaliation under RCW 49.60.210(1), a plaintiff must show that (1) he or she engaged in statutorily protected activity, (2) he or she suffered an adverse employment action, and (3) there was a causal link between his or her activity and the other person's adverse action." Currier v. Northland Servs., Inc., 182 Wn. App. 733, 742, 332 P.3d 1006 (2014). The first element describes opposition to "any practices forbidden by" chapter 49.60 RCW. Id. at 742-43 (quoting RCW 49.60.210(1)). When a person reasonably believes she is opposing discriminatory practices, RCW 49.60.210(1) protects that person whether or not the practice is actually discriminatory. Id. at 743 (citing Ellis v. City of Seattle, 142 Wn.2d 450, 461, 13 P.3d 1065 (2000)).

LaBounty argued that her concern for her safety, her attempts to involve her union representative, and her attempts to request an accommodation for her medical conditions were all protected activities. She argues that her poor performance review, the District's increased scrutiny, or "bird-dogging," and her termination were all adverse employment actions. And she argues causation can be proved by the close proximity in time of the District's adverse actions to her protected activities.

In defense, the District argues that LaBounty did not identify any opposition to activity forbidden by RCW 49.60—in other words, that she did not

engage in any protected activity. The District points out that while LaBounty complained about coworkers and about feeling disrespected by a student, she never alleged she was subjected to a hostile workplace based on her disability or otherwise, and that these complaints are not activities that could form the basis for a retaliation claim. Additionally, the District contends that LaBounty "disengaged from the interactive accommodation process" by failing to communicate with the District about her condition or possible reasonable accommodations.

The District also argued in defense that LaBounty did not suffer an adverse employment action because she "never showed up for a single day of work in the 2019-2020 school year" and she "abandoned her job altogether." If LaBounty abandoned her job, then Sewright's recommending her termination could not be an adverse employment action.

Finally, the District argues in defense that to the extent the alleged protected activity was her retention of counsel regarding her claims, LaBounty cannot prove the element of causation. On November 21, 2019, Sewright sent LaBounty a letter advising that Sewright was recommending LaBounty's termination to the District's board. The next day, November 22, Sewright received an email from the office of LaBounty's counsel. Attached to the email was a letter LaBounty's counsel wrote to Sewright informing her that LaBounty had retained counsel to represent her regarding harassment, bullying, and retaliation claims arising out of her employment. That attached letter is dated

November 14, *before* Sewright recommended terminating LaBounty. However, the District presented evidence that this letter was sent to the wrong email address, so Sewright did not receive it until *after* she recommended termination.[8]

LaBounty's overarching argument is that her evidence is stronger: "LaBounty put forth detailed facts based on firsthand knowledge – the District did not." But this is not, as discussed above, the standard when the court is deciding a motion to vacate. The court acted within its discretion in determining that the District met its burden to demonstrate the existence of a prima facie defense to LaBounty's retaliation claim.

### C.  Wrongful discharge in violation of public policy

LaBounty's complaint alleges her termination by the District was in violation of public policy. Wrongful discharge in violation of public policy is a narrow exception to the doctrine of employment at will. Martin v. Gonzaga Univ., 191 Wn.2d 712, 723, 425 P.3d 837 (2018). To prevail, "a plaintiff employee must demonstrate that . . . her 'discharge may have been motivated by reasons that contravene a clear mandate of public policy.' " Id. (quoting Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 232, 685 P.2d 1081 (1984)). "[T]he public-policy-linked conduct" must have been "a significant factor in the decision to discharge the worker." Mackey v. Home Depot USA, Inc., 12 Wn. App. 2d 557,

---

[8] LaBounty's counsel's letter dated November 14 says it was delivered "VIA EMAIL ONLY" to "msewright@mtbaker.wed.net.edu." On November 26, Sewright replied to LaBounty's counsel, asking, "What report of 'harassing conduct and safety issues' do you believe to be the basis for such claims?" Her letter also states: "My email address is msewright@mtbaker.*wednet*.edu, *not* msewright@mtbaker.*wed.net*.edu (emphasis added)."

578, 459 P.3d 371 (2020) (citing <u>Martin</u>, 191 Wn.2d at 723). If so, " 'the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee.' " <u>Martin</u>, 191 Wn.2d at 723 (quoting <u>Thompson</u>, 102 Wn.2d at 232-33).

In defense, the District's motion to vacate argued that LaBounty's wrongful termination claim failed for the same reasons given above regarding failure to accommodate and retaliation. On appeal, the District argues specifically that "LaBounty abandoned her job," pointing to a letter from Sewright to LaBounty purporting to show that LaBounty failed to attend staff development days and "the first day of school," and "never showed up for a single day of work in the 2019-2020 school year."

In her opening brief, LaBounty acknowledges that on appeal and below, her briefing's "focus is on retaliation." As to the other issues, the "lack of reasoned argument is insufficient to merit judicial consideration." <u>Palmer v. Jensen</u>, 81 Wn. App. 148, 153, 913 P.2d 413 (1996). Consequently, we conclude that the court did not abuse its discretion when it found the District met its burden to demonstrate the existence of a prima facie defense to LaBounty's wrongful discharge claim.

### D. Negligent supervision, defamation, and outrage

LaBounty's complaint raises additional claims, including that the District negligently supervised her colleague Kirkley, her supervisor Goodwin, Principal Durand, and Superintendent Sewright. She also alleges that the District's annual

review of her constituted defamation, and that the District engaged in intentional infliction of emotional distress. In defense, the District argued that LaBounty's complaint does not contain sufficiently specific allegations regarding any of these claims.

First, LaBounty's complaint does not allege that any of its employees acted outside the scope of their employment, as is required for a negligent supervision claim, but only that the District "knew or should have known [its employees] acted in a discriminatory and/or retaliatory manner towards [LaBounty] *when addressing allegations*" she made. Clerk's Papers 16 (emphasis added).[9]

Second, regarding LaBounty's defamation claim, the District notes that she does not identify with specificity any particular statement, and it points to evidence the performance evaluation was not false, including Sewright's declaration and attached exhibits that establish LaBounty was not present at her assigned class during the 2018-19 school year on numerous occasions.[10]

Finally, in defense to LaBounty's claim of outrage, the District argues that an employer does not owe a duty to provide its employees with a stress-free work environment, citing Bishop v. State, 77 Wn. App. 228, 234-35, 889 P.2d 959

---

[9] "In Washington, a cause of action for negligent supervision requires a plaintiff to show that an employee acted *outside* the scope of his or her employment." LaPlant v. Snohomish County, 162 Wn. App. 476, 479, 271 P.3d 254 (2011).

[10] Proof of defamation requires a showing of (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. Clardy v. Cowles Pub. Co., 81 Wn. App. 53, 57, 912 P.2d 1078 (1996) (citing LaMon v. Butler, 112 Wn.2d 193, 197, 770 P.2d 1027, cert. denied, 493 U.S. 814, 110 S. Ct. 61, 107 L. Ed. 2d 29 (1989)) (other citation omitted).

(1995). The District argues the evidence "belie[s]" any allegation of outrageous behavior on its part because it shows Sewright believed LaBounty had resolved the issue with her colleague Kirkley, gave the student at issue a new supervision plan, and attempted to learn LaBounty's medical condition and needs for an accommodation.[11]

LaBounty did not provide specific argument addressing the District's defenses to these claims, instead stating that her briefing's "focus is on retaliation." Therefore, we conclude that the court did not abuse its discretion when it determined the District satisfied its burden of showing the existence of a prima facie defense to these claims.

## II.     Mistake or excusable neglect

The trial court ruled the District's failure to timely appear or file an answer "was occasioned by a mistake of Defendant's legal counsel for failing to promptly file a notice of appearance." LaBounty argues that the District's counsel's "internal office failure" is not excusable neglect. The District argues the court did not abuse its discretion by finding its counsel's mistake caused its failure to timely appear or answer. We agree with the District.

---

[11] The claim of intentional infliction of emotional distress, or outrage, requires emotional distress that is inflicted "intentionally or recklessly; mere negligence is not enough," and the conduct "must be outrageous and extreme." Grimsby v. Samson, 85 Wn.2d 52, 59, 530 P.2d 291 (1975). "Liability exists 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " Id. (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW INST. 1965)).

"[I]f a company's failure to respond to a properly served summons and complaint was due to a breakdown of internal office procedure, the failure was not excusable." TMT, 140 Wn. App. at 212. For example, in TMT, the plaintiff served process on a legal assistant in the company's general counsel's office, but the legal assistant failed to calendar the information or notify the general counsel. Id. at 213. Then, the legal assistant was away from work for several weeks due to vacation and an injury; temporary workers also failed to calendar the information. Id. We reasoned that the legal assistant's failure to calendar the deadline, the subsequent failure to ensure the temporary workers were trained to do so, and the failure to institute other procedures to inform the general counsel of the lawsuit constituted "a breakdown in internal office management and procedure" and was, therefore, inexcusable neglect. Id. See also Johnson, 116 Wn. App. at 848 (inexcusable neglect where summons and complaint served on store manager, who thought documents were irrelevant to store's business and provided no explanation for failing to inform company's administration or legal counsel that she received them); Prest v. Am. Bankers Life Assur. Co., 79 Wn. App. 93, 100, 900 P.2d 595 (1995) (finding inexcusable neglect when summons and complaint were forwarded to person designated to receive process, but that person had been reassigned and was out of town, and the file was "mislaid" and not forwarded to the proper person in time). In these examples of inexcusable neglect, the party was served properly, but the party's internal office procedures

broke down, resulting in the proper person not receiving notice of the lawsuit, which then caused the party's failure to appear and respond to the complaint.

By contrast, a mistake is different from inexcusable neglect; a mistake "results from a misunderstanding." Ha, 182 Wn. App. at 451. For example, where an insured party was properly served and tendered a defense of claim to its insurer, but the claims manager sent the wrong case file to the law firm, the reason for failing to appear was held to be a mistake. Berger v. Dishman Dodge, Inc., 50 Wn. App. 309, 311, 748 P.2d 241 (1987). The court held the defendant "had no reason to believe that [its] interests were not being protected after promptly forwarding the documents to the insurer." Id. at 312.[12]

Likewise, in Ha, the failure to appear was due to a mistake. 182 Wn. App. at 454.[13] There, the plaintiff sued a company that was in bankruptcy and asked the independent bankruptcy attorney to accept service of process. Id. at 443. The company's bankruptcy attorney accepted process, then forwarded the documents to the company's financial advisor, who forwarded them to the wrong insurance company. Id. at 444. Because the company's bankruptcy attorney was not the company's general counsel and neither he nor the company's financial

---

[12] The Berger court's analysis accounted for the principle that, in the insurance context, the acts or omissions of an insurer can be imputed to its insured. 50 Wn. App. at 312. Nonetheless, because the dealership had no reason to believe its interests were not being protected, because it quickly moved to vacate, and because it explained the mistake at issue, the court affirmed the vacation of the default judgment. See Akhavuz v. Moody, 178 Wn. App. 526, 537, 315 P.3d 572 (2013) (discussing Berger).

[13] The trial court had not specified whether it vacated for lack of personal jurisdiction, for mistake or excusable neglect under CR 60(b)(1), or for manifest injustice under CR 60(b)(11), all of which were claimed by the company's motion. Id. at 441.

advisor were office employees, "their mistakes were not a breakdown of internal procedure, and so the rule of TMT does not apply here." Id. at 451. The court also noted that "[t]hese facts demonstrate that [the company]'s failure to respond was not deliberate or even neglectful." Id. at 452.[14]

Showalter v. Wild Oats likewise illustrates a mistake, rather than neglect. 124 Wn. App. 506, 101 P.3d 867 (2004). There, after the defendant company was properly served, a paralegal asked a safety and risk manager to give the summons and complaint to the company's internal claims administrator, who would then notify the outside claims administrator, who would then hire defense counsel. Id. at 514. The safety and risk manager misunderstood the paralegal's request, as it was contrary to customary business practice, and did not forward the notice; as a result, the company did not timely answer. Id. We reasoned that the company "did not intentionally fail to respond," and that "the circumstances surrounding the misunderstanding between [the company's] staff are more akin to a mistake than inexcusable neglect." Id. at 514-15.

The present case does not involve a breakdown of the defendant party's office procedure, but instead is more like the cases involving mistakes. After

---

[14] The Ha court addressed the concept that an attorney's acts are binding on the client, distinguishing the case of Haller v. Wallis, 89 Wn.2d 539, 547, 573 P.2d 1302 (1978), which involved a consent judgment. See Ha, 182 Wn. App. at 452-53. There are different "equities at play in consent judgments . . . versus default judgments." Id. at 453. "[C]onsent judgments may not be set aside for excusable neglect—only for fraud or mutual mistake." Id. With respect to default judgments, " '[w]hat is just and proper must be determined by the facts of each case, not by a hard and fast rule applicable to all situations regardless of the outcome.' " Id. (quoting Akhavuz, 178 Wn. App. at 534-35). Thus, the fact that in the present case it was the District's counsel rather than the District whose mistake caused the failure to appear is not dispositive.

21

Superintendent Sewright received LaBounty's summons and complaint on behalf of the District, she promptly forwarded it to the District's counsel that same day. Like the defendant in Berger, the District had no reason to believe its interests were not being protected after it promptly forwarded the documents to its attorney. The failure to appear was not due to the party's failure to inform counsel of the lawsuit, but because counsel "misunderstood" her legal assistant's email stating "NOA is done" to mean counsel's notice of appearance had been filed. Thus, the District's failure to appear was based on counsel's mistaken belief that her assistant had completed the filing, not any intention by the defendant to fail to respond, similar to Showalter. The trial court did not abuse its discretion in determining the cause of the failure to appear was a mistake by District's counsel.

### III.    Due diligence

What constitutes a "reasonable time" to move to vacate a default judgment that satisfies the due diligence requirement depends on the facts and circumstances of each case. Luckett v. Boeing Co., 98 Wn. App. 307, 312, 989 P.2d 1144 (1999). "The critical period is between when the moving party became aware of the judgment and when it filed the motion to vacate." Ha, 182 Wn. App. at 454. Three months has been held not to be a reasonable time to respond. Id. (citing Gutz v. Johnson, 128 Wn. App. 901, 919, 117 P.3d 390 (2005), aff'd by Morin, 160 Wn.2d at 758). But entering an appearance just over a month after receiving notice of default judgment and moving to vacate within two and a half

months of receiving notice has been held sufficient to demonstrate diligence. Id. at 454-55.

Here, the trial court found that the District, through its counsel, "acted diligently to address the June 13 default judgment." After LaBounty obtained default judgment on June 13, she hand-delivered it to Sewright on either July 12 or 14. Counsel for the District filed a notice of appearance that same week, on July 15. Then, the District moved to vacate the court's orders of default, default judgment, and findings of fact and conclusions of law on July 25, at most 13 days after it learned about the court's order of default judgment.

LaBounty contends that "the District did not act with due diligence with regard to pursuing its motion to vacate" and by failing to file an answer. As for its answer, the District had no obligation to file an answer *before* the court vacated LaBounty's default judgment.[15]

At oral argument below, LaBounty argued that under CR 60, the District was supposed to move the court for an order to show cause. Not doing so does not show a material lack of diligence on the District's part, because the District

---

[15] LaBounty seizes on the words "and answer" in the second White factor to argue the District did not act with due diligence because it did not answer her complaint when it moved to vacate. LaBounty misunderstands the White factors and CR 60. The second White factor pertains to whether "the moving party's failure to timely appear in the action, and answer the opponent's claim, was occasioned by mistake, inadvertence, surprise or excusable neglect." 73 Wn.2d at 352. It does not pertain to due diligence, which is the third White factor: "that the moving party acted with due diligence after notice of entry of the default judgment." Id. Nor does CR 60 require an answer. See CR 60. Regardless, once the court granted the District's motion to vacate on September 14, reinstating the action, the District answered LaBounty's complaint five days later on September 19.

served its motion on LaBounty and re-noted the motion hearing for a week later to ensure she had notice. And LaBounty waived any resulting procedural error.

We conclude the court did not abuse its discretion by deciding the District acted diligently in filing a notice of appearance the same week it learned the court had entered default judgment against it and by filing a motion to vacate at most 13 days after it learned about the default judgment.

IV.    Deprivation of finality as prejudice

LaBounty argues the court's order granting the District's motion to vacate is a hardship that "deprive[d her] of finality," and that the hardship "should be borne by the District and their counsel due to their admitted negligence in saying 'I accept full responsibility.' " However, "the prospect of trial cannot constitute, without more, 'substantial hardship' within the meaning of White's fourth factor." Pfaff, 103 Wn. App. at 836. Here, the court imposed costs and fees against the District for "[a]ny hardship" LaBounty suffered from the District's failure to timely appear and answer. The court did not abuse its discretion in its consideration of the fourth White factor.

White "is not a mechanical test [and] whether or not a default judgment should be set aside is a matter of equity." Little v. King, 160 Wn.2d 696, 704, 161 P.3d 345 (2007). But " 'whether or not justice is being done' " is the "fundamental principle" when balancing finality against determining disputes " 'on the merits rather than by default.' " Id. at 703 (quoting Griggs, 92 Wn.2d at 581-82). It is for this reason that "we will liberally set aside default judgments . . . for equitable

24

reasons in the interests of fairness and justice." <u>Morin</u>, 160 Wn.2d at 749. Particularly when, as here, the party seeking to vacate the default has presented a thorough defense on the merits, "[w]e prefer to give parties their day in court and have controversies determined on their merits." <u>Id.</u> at 754.

We affirm the court's order granting the District's motion to vacate the default judgment.

V.    <u>Costs and fees</u>

An appellant who substantially prevails on review is entitled to costs. RAP 14.2; RAP 14.1(d). An appellant may recover reasonable attorney fees if applicable law grants that right and they devote a section of their opening brief to the request. RAP 18.1(a), (b).[16]

LaBounty does not prevail on appeal, and whether she will prevail below on any claims providing a right to fees remains to be determined. Accordingly, we deny her request for costs and fees.

Affirmed.

---

[16] In her opening brief, LaBounty requested costs and fees if she prevailed on appeal because she was awarded costs and fees by the court's default judgment and its order vacating default judgment. The District contends LaBounty did not satisfy RAP 18.1(a). In her reply brief, LaBounty added "RCW 49.60 et seq[.]" as an additional basis for costs and fees.

Chung, J.

WE CONCUR:

Brennan, J.

Mann, J.