IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of:<br><br>R.N. | No.87353-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — A trial court ordered R.N. involuntarily committed for treatment for a period of up to 14 days pursuant to the Involuntary Treatment Act (ITA), chapter 71.05 RCW. On appeal, R.N. challenges his commitment, arguing that there was not substantial evidence to support the court's findings and it erred in concluding that he posed a likelihood of serious harm. We disagree and affirm.

BACKGROUND

R.N. began renting an apartment at Union Hotel in October 2023. Union Hotel is a permanent supportive housing residence operated by Downtown Emergency Service Center. R.N. leased a private apartment that was not shared but shared walls with other neighbors. The building also has a communal lobby space downstairs.

Due to a pattern of destructive conduct at Union Hotel over the previous six months, a "Petition for Initial Detention (Non-Emergency)" was filed on October 14, 2024. On October 15, King County Superior Court Judge Karen Donohue signed a non-emergency order that R.N. be detained and taken to "an evaluation and treatment facility" because he "presents a likelihood of serious harm: to the property of others."

R.N. was taken to Fairfax Hospital (Fairfax) and examined for a mental disorder. Before the 120-hour initial detention period expired on October 22, Fairfax filed a "Petition For 14 Day Involuntary Treatment" and reported that R.N. has "a likelihood of serious harm to others and/or others' property" and shows "an increased loss of cognitive and volitional functioning, poor insight regarding symptoms" that "requires the monitoring and stabilization of an inpatient psychiatric hospital."

The trial court held a probable cause hearing on Fairfax's petition on October 23, 2024. At the hearing, the State presented three witnesses that spoke to R.N.'s condition: Brandon Lehnerz, the project manager at Union Hotel, Fema Pierce, a clinical support specialist at Union Hotel, and Laura Yen, the court evaluator for Fairfax. The court granted Fairfax's petition after determining that R.N. presented a likelihood of serious harm to the property of others and that a less restrictive alternative was not in R.N.'s best interest at the time. R.N. timely appeals.

## DISCUSSION

Under the ITA, a person may be involuntarily committed for treatment of behavioral health disorders.[1] In re Det. of LaBelle, 107 Wn.2d 196, 201-02, 728 P.2d 138 (1986). However, a behavioral health disorder alone is not enough to permit the significant deprivation of liberty encompassed by a commitment order for involuntary treatment. Id. at 201. A court can order commitment for involuntary treatment if the person presents a likelihood of serious harm or is gravely disabled. RCW

---

[1] A "behavioral health disorder" is defined as "either a mental disorder as defined in this section, a substance use disorder as defined in this section, or a co-occurring mental disorder and substance use disorder." RCW 71.05.020(8). A "mental disorder" is defined as "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(39). Instead of the term "mental disorder," the witnesses and the trial court used the term "mental health disorder."

71.05.240(4)(a). The ITA defines "likelihood of serious harm" in several distinct, alternative ways, including, as relevant here, "[a] substantial risk that . . . physical harm will be inflicted by a person upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others." RCW 71.05.020(37)(a)(iii). Before a court can order an individual to be committed to a licensed treatment facility, it must also consider whether any less restrictive alternatives to involuntary detention and treatment "are in the best interest of such person or others." RCW 71.05.240(4)(a).

For a 14-day commitment due to likelihood of serious harm, the State must prove that a person presents a likelihood of serious harm by a preponderance of the evidence. RCW 71.05.240(4)(a). " 'The preponderance of the evidence standard requires that the evidence establish the proposition at issue is more probably true than not true.' " State v. Arredondo, 188 Wn.2d 244, 257, 394 P.3d 348 (2017) (quoting Mohr v. Grant, 153 Wn.2d 812, 822, 108 P.3d 768 (2005)). Moreover, although the 14-day commitment has already occurred, appeals of involuntary commitments are not moot because the challenged order, albeit expired, "may have adverse consequences on future involuntary commitment determinations." In re Det. of M.K., 168 Wn. App. 621, 625, 279 P.3d 897 (2012).

On appeal, we review whether substantial evidence supports a trial court's findings of fact and, if so, whether those findings support its conclusions of law. LaBelle, 107 Wn.2d at 209. Substantial evidence is "the quantum of evidence 'sufficient to persuade a fair-minded person of the truth of the declared premise.' " In re Det. of K.P., 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024) (quoting In re Det. of H.N., 188 Wn.

App. 744, 762, 355 P.3d 294 (2015)). We review substantial evidence claims in the light most favorable to the State. In re Det. of B.M., 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019). The trial court's determination of whether a person presents a likelihood of serious harm and that a less restrictive alternative is not appropriate nor in respondent's best interest constitutes a legal conclusion, rather than a finding of fact. See M.K., 168 Wn. App. at 623 n.3 (2012) (treating incorrectly labeled finding of "grave disability" as a conclusion of law because it resolves the ultimate issue in the case). We review conclusions of law de novo. See In re Det. of D.H., 1 Wn.3d 764, 774, 533 P.3d 97 (2023).

Here, the trial court concluded that R.N. presented a likelihood of serious harm to the property of others under RCW 71.05.020(37)(a)(iii). The court also concluded that a less restrictive alternative was "not in [R.N.'s] best interests." On appeal, R.N. assigns error to both of these conclusions as well as to the finding that R.N.'s behavioral health disorder had "a substantial adverse effect upon [his] cognitive and volitional functioning as evidenced by his symptoms and presentation." R.N. also argues substantial evidence did not support the trial court's finding that he would "pose a substantial risk of harm to the property of others outside of his private room" because the "evidence failed to support a logical extrapolation that if R.N. damaged this apartment, he would therefore damage every other place he might live." Furthermore, R.N. contends that a less restrictive alternative should have been granted because of "the potential treatment options that would be available to R.N. on an outpatient basis."

I. <u>Likelihood of Serious Harm to Property of Others</u>

The trial court determined that based on R.N.'s mental health disorder, R.N. posed a likelihood of serious harm to others' property. The court explained,

> as a result of his mental health disorder, [R.N.] suffers from paranoid delusions, and disorganized thoughts. He is isolative to his room, . . . has illogical thought processing . . . [is] confused and disorganized, irritable and experiencing hallucinations.
> . . . .
> [R.N.] believes that there are people living in his walls, children trapped behind walls and he needs to get them out because the children are being raped . . . [and] neighbors are coming through the walls. As a result, [R.N.] has engaged in very destructive behavior that has pretty much destroyed everything in his apartment — kitchen has been ripped out, sink pulled out, multiple holes in drywall, tile and floor ripped up and holes in the subfloor.
> . . . .
> No one else has gone in[to R.N.'s apartment].

The testimony and evidence presented at the hearing provided substantial evidence to support the court's findings. At the time of the probable cause hearing, R.N. had a working diagnosis of schizophrenia and suffered from paranoid delusions and hallucinations. R.N. believed that there were people living in his walls, neighbors coming through the walls, and children trapped behind the walls that he needed to get out because they were being raped.

The evidence presented at the hearing demonstrated that these beliefs and delusions were caused by his mental health disorder and prompted R.N. to engage in destructive conduct, causing substantial damage to his apartment. Lehnerz testified that after causing "some damage," R.N. was placed on the "elevated concern list" in May of 2024, a list staff at Union Hotel use "if we feel that someone is a risk to themselves or others." Lehnerz also testified that from May 2024 through the date he was detained in October, R.N. had consistently damaged his apartment.

During the hearing, Lehnerz described "the last instance" of damage to the apartment as "way much more damage than [he] had seen before." Lehnerz testified that upon entering R.N.'s apartment on October 9, he saw that the oven and stove were dismantled, the exhaust fan was ripped out, the sink was torn from the wall, and the cabinet doors and dining table were broken. Moreover, the electrical outlets appeared to be tampered with, the floor had water damage, floor tiles were ripped out and there were holes in the subfloor. Lehnerz declared that there were reports of R.N. flooding his unit on October 8, 2024. The damage was estimated to cost over $10,000 in repairs.

When Lehnerz spoke with R.N. about the damage, R.N. told him that specific neighbors and other unidentified people came through the wall and caused the damage. Pierce testified similarly regarding who R.N. claimed caused the damage. Pierce testified that she watched days of surveillance footage to see if anybody else had gone into R.N.'s apartment, but nobody "was seen going in or out of the apartment when extensive damage was caused." Both Lehnerz and Pierce testified that the damage rendered the apartment uninhabitable.

Yen testified that R.N. had a working diagnosis of schizophrenia and was "exhibiting delusions with paranoia, disorganized thinking, as well as negative symptoms, isolation, not engaging in activities, and spending a lot of time in his room." In reaching her conclusion, Yen relied on an interview with R.N., R.N.'s medical record, psychiatric evaluation and progress notes, R.N's treatment team, and the testimony of Lehnerz and Pierce. Notes from Fairfax's records indicated that R.N. was "irritable and paranoid about taking meds" and "display[ed] poor insight." Multiple notes indicated that R.N. had "poor thought processing, illogical thoughts," was guarded, uncooperative with

his medical assessment, and refused to complete his admission psychiatric evaluation or take his antipsychotic medication. R.N. also experienced hallucinations.

Additionally, Yen testified that R.N.'s schizophrenia had a substantial adverse effect on R.N.'s cognitive and volitional control over his actions. Yen concluded that as a result of his mental health disorder, R.N. presented a substantial risk of inflicting physical harm on the property of others. Yen based her conclusion on R.N.'s repeated and escalating cycle of property damage and his lack of active engagement with his mental health provider and with his medications. Further, Yen testified that until R.N.'s symptoms causing paranoia, delusions, "impaired insight and judgment where he's feeling like people are in the walls or coming through the walls" are under control, "it's very likely that he will continue the behaviors of taking things apart to try and get to those people, causing all kinds of damage in an effort to kind of unearth those delusional characters."

The evidence demonstrates that R.N. suffered from a mental health disorder that caused him to experience hallucinations, paranoia, delusion, impaired judgment, and poor thought processing and insight which led him to believe there were people in the walls, causing him to engage in destructive behavior toward his apartment. And, as his medical record shows, R.N. continued to experience symptoms in the hospital.

Accordingly, the State satisfied the ITA's third definition for "likelihood of serious harm" under RCW 71.05.020(37)(a)(iii), and there was substantial evidence to support the court's findings that R.N.'s mental health disorder caused him to engage in destructive behavior toward his apartment, which created a substantial risk that physical harm would be inflicted upon the property of others.

7

R.N. argues, however, that while he had damaged his apartment, it was rendered uninhabitable and, thus, he would not be returning to it. He contends that the evidence failed to support a logical extrapolation that if R.N. damaged this apartment, he would therefore damage every other place he might live, so he did not pose a substantial risk or harm to the property of others outside his private room. We find this argument unavailing.

Generally, this court has interpreted RCW 71.05.020 to require " 'a showing of a substantial risk of physical harm as evidenced by a recent overt act.' " Matter of Det. of T.C., 11 Wn. App. 2d 51, 57, 450 P.3d 1230 (2019) (quoting In re Harris, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982)). Such an act may be one that has caused harm or creates a reasonable apprehension of dangerousness. Id.

The applicable definition for "likelihood of serious harm" requires evidence that the person's behavior demonstrates a substantial risk that "physical harm will be inflicted upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others." RCW 71.05.020(37)(a)(iii). The statute does not require the State to establish specific property as to which there is a substantial risk that physical harm will be inflicted. Nor does the statute require proof of a generalized or universal threat to all property the person may encounter. Rather, the statute specifies that a likelihood of serious harm to "the property of others" may be established by prior "behavior which has caused substantial loss or damage to the property of others." Id.

Similarly, the second definition for "likelihood of serious harm" includes parallel language and requires a substantial risk that "physical harm will be inflicted by a person

8

upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm." RCW 71.05.020(37)(a)(ii). We have held this definition is satisfied where the defendant became agitated and expressed frustration through comments following a confrontation by a single individual who testified being fearful due to the incident. See, e.g., T.C., 11 Wn. App. 2d at 57. Thus, we reject R.N.'s contention that proof of prior damage directed only at particular property is insufficient to establish a substantial risk of harm to *other* property.

Therefore, as in T.C., in which the evidence establishing likelihood of serious harm to others was based on comments involving a single person, here, the evidence of R.N.'s prior destructive behavior toward one apartment was sufficient to establish a likelihood of serious harm to the property of others. R.N.'s destructive behavior toward his apartment was estimated to cost over $10,000 in repairs and rendered the unit uninhabitable. Yen expressed concern that R.N. would continue to engage in this behavior if he was not detained given his mental health disorder. It would be illogical to require proof of harm or potential harm to additional property because R.N.'s prior conduct made his prior apartment uninhabitable such that he could not return to it. The ITA does not so require.

## II. Less Restrictive Alternative

Finally, R.N. challenges the trial court's determination "that a less restrictive alternative is not appropriate nor in [R.N.'s] best interests because he is not mentally stable, he does not recognize he has a mental impairment, and is periodically not willing to take medication, which does not bode well for compliance with a less restrictive

treatment." He contends that that the trial court erred by not compelling medication and by not ordering a less restrictive alternative because it ignored "the potential treatment options that would be available to R.N. on an outpatient basis." We disagree.

R.N. argues that the court could have addressed a concern "about medication compliance" as "it had the authority to order R.N.'s compliance with regular medication management services, and/or continued involuntary antipsychotic medication." Yen testified that at the hospital, R.N. was paranoid about taking his medications on multiple occasions and took his antipsychotic medication only because there was a court order compelling him to do so. But the record does not show that R.N. ever asked the trial court to enforce the prior order compelling him to take antipsychotic medication, nor did he ask the trial court to consider forcefully medicating him with the mood stabilizing medication as a less restrictive alternative. Therefore, the court did not err in finding that R.N. was not stabilized or compliant with his medication such that he could comply with a less restrictive alternative, even without considering an order to compel medication against his consent.

R.N. also argues that "if the court was concerned about property damage, it had the authority to order a less restrictive alternative of residing in a facility without a private apartment." R.N. suggests the court "simply accepted" Yen's "conclusory assertion that the 'services available to [R.N.] outpatient are [not] going to be enough to help him regain stability enough to be safe in the community.' "

However, the record demonstrates there was substantial evidence to support the court's findings on this issue. R.N. repeatedly displayed poor insight, specifically into his need for treatment, behaved in a guarded manner, and was uncooperative with medical

10

providers. Moreover, R.N. was still experiencing symptoms in the hospital. Yen testified that R.N.'s improvements "are a result of him being in [an inpatient] environment that is very supportive" such that if he did not receive treatment in such a setting, R.N. would "return to the same behavior that brought him in" with symptoms causing him to engage in "behaviors that are destructive." Accordingly, in its oral ruling, the trial court found that R.N. was "not yet stabilized" or "compliant with his medication" and "therefore, [a] less restrictive alternative is something that he likely could not comply with is and is not in his best interest at this time."

Thus, substantial evidence supported the trial court's determination that a less restrictive alternative was not in R.N.'s best interest.

## CONCLUSION

We affirm.

_Chung, J._

WE CONCUR:

_Birk, J._      _Díaz, J._

11